## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

| | | |
|---|---|---|
| Valtrus Innovations Ltd. | § | C.A. NO. 2:24-cv-00361-JRG-RSP |
| | § | |
| **Plaintiff,** | § | **JURY TRIAL DEMANDED** |
| | § | |
| v. | § | **LEAD CASE** |
| | § | |
| NTT Data Services, LLC et al | § | |
| | § | |
| **Defendant.** | § | |
| Vertiv Corporation, | § | C.A NO. 2:24-cv-00907-JRG |
| | § | **JURY TRIAL DEMANDED** |
| **Plaintiff,** | § | |
| | § | |
| v. | § | |
| | § | |
| Valtrus Innovations Ltd., | § | |
| | § | |
| **Defendant.** | § | |

### DEFENDANT VALTRUS INNOVATIONS LIMITED'S
### RESPONSIVE CLAIM CONSTRUCTION BRIEF

# **TABLE OF CONTENTS**

**Page**

I.    Introduction ................................................................................................... 1

II.    Argument ....................................................................................................... 1

    A.    U.S. Patent No. 6,718,277 ................................................................... 1

        1.    "empirical atmospheric map" / "empirical thermal map" (claims 1, 12, 22) ... 1

        2.    "template atmospheric map"/ "template thermal map" (claims 1, 12, and 22) 5

        3.    "comparing said empirical atmospheric map to a template atmospheric map" / "comparing said empirical thermal map to a template thermal map" (claims 1, 12, and 22) ................................................................................ 6

        4.    "pattern differentials" (claims 1, 12, and 22) .................................... 9

    B.    U.S. Patent No. 6,854,287 ................................................................... 10

        1.    "A method for cooling a room configured to house a plurality of computer systems" (claim 1) ........................................................................ 10

        2.    "an air conditioning unit" (claims 1-2, 7-8, 10, 14, 16, 18, 20-21) ............... 13

    C.    U.S. Patent No. 6,862,179 ................................................................... 15

        1.    "cooling fluid" (claims 1-4, 6-9, 13-22, 25-28, 32-36, 40) ............................ 15

        2.    "controllable partition" (claims 1, 9, 16, 22, 27, 29-31, 37-41) .................... 18

        3.    "movable device configured to detect at least one environmental condition at various locations of said data center" (claims 9 and 22) ............... 23

    D.    U.S. Patent No. 7,031,870 ................................................................... 24

        1.    "calculate/calculating indices of air re-circulation" terms (claims 1-5, 7-25, 27-41 ) ........................................................................ 24

III.    Conclusion .................................................................................................... 29

## **TABLE OF AUTHORITIES**

**Page(s)**

**Federal Cases**

*01 Communique Lab'y, Inc. v. LogMeIn, Inc.*,
   687 F.3d 1292 (Fed. Cir. 2012)........................................................................14

*Augme Techs., Inc. v. Yahoo! Inc.*,
   755 F.3d 1326 (Fed. Cir. 2014)........................................................................22

*Baldwin Graphic Sys., Inc. v. Siebert, Inc.*,
   512 F.3d 1338 (Fed. Cir. 2008)........................................................................13

*BASF Corp. v. Johnson Matthey Inc.*,
   875 F.3d 1360 (Fed. Cir. 2017)........................................................................24

*CAE Screenplates Inc. v. Heinrich Fiedler GmbH & Co.*,
   224 F.3d 1308, 1317 (Fed. Cir. 2000)..............................................................22

*Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*,
   289 F.3d 801 (Fed. Cir. 2002)..........................................................................11

*Dow Chem. Co. v. Nova Chemicals Corp. (Canada)*,
   803 F.3d 620 (Fed. Cir. 2015)....................................................................28, 29

*EPOS Techs. Ltd. v. Pegasus Techs. Ltd.*,
   766 F.3d 1338 (Fed. Cir. 2014)..........................................................18, 20, 23

*Finalrod IP, LLC v. Endurance Lift Sols., Inc.*,
   2021 WL 2187980 (E.D. Tex. May 28, 2021)..................................................29

*Geoscope Techs. Pte. Ltd v. Apple Inc.*,
   2023 WL 4629539 (E.D. Va. July 19, 2023)....................................................27

*K-fee Sys. GmbH v. Nespresso USA, Inc.*,
   89 F.4th 915 (Fed. Cir. 2023) .............................................................................4

*Karlin Tech. Inc. v. Surgical Dynamics, Inc.*,
   177 F.3d 968 (Fed. Cir. 1999)..........................................................................21

*Nabors Drilling Techs. USA, Inc. v. Helmerich & Payne Int'l Drilling Co.*,
   No. 2022 WL 3448648 (N.D. Tex. Aug. 17, 2022)..........................................29

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
   572 U.S. 898 (2014)..........................................................................................24

*Olivarez v. GEO Grp., Inc.*,
    844 F.3d 200 (5th Cir. 2016) ................................................2

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005)............................................ *passim*

*Rehco LLC v. Spin Master, Ltd.*,
    759 F. App'x 944 (Fed. Cir. 2019) ......................................13

*Seagen Inc. v. Daiichi Sankyo Co.*,
    2021 WL 4168660 (E.D. Tex. Sept. 14, 2021) ....................24

*Seven Networks, LLC v. Google LLC*,
    2018 WL 4501952 (E.D. Tex. July 11, 2018) .......................2

*Shoes by Firebug LLC v. Stride Rite Children's Grp., LLC*,
    962 F.3d 1362 (Fed. Cir. 2020)........................................11, 12

*SIMO Holdings Inc. v. Hong Kong uCloudlink Network Tech. Ltd.*,
    983 F.3d 1367 (Fed. Cir. 2021) ..........................................14

*Symantec Corp. v. Comput. Associates Int'l, Inc.*,
    522 F.3d 1279 (Fed. Cir. 2008)........................................12, 13

*Teleflex, Inc. v. Ficosa N. Am. Corp.*,
    299 F.3d 1313 (Fed. Cir. 2002)........................................14, 15

*Teva Pharm. USA, Inc. v. Sandoz, Inc.*,
    574 U.S. 318 (2015)........................................................13, 15

*Teva Pharm. USA, Inc. v. Sandoz, Inc.*,
    789 F.3d 1335 (Fed. Cir. 2015)........................................28, 29

*Thorner v. Sony Comput. Entm't Am. LLC*,
    669 F.3d 1362 (Fed. Cir. 2012)..........................................4, 6

*Wenger Mfg., Inc. v. Coating Mach. Sys., Inc.*,
    239 F.3d 1225 (Fed. Cir. 2001)..........................................21

## I.    INTRODUCTION

Vertiv Corporation ("Vertiv") has proposed constructions for 9 terms across U.S. Patent No. 6,718,277 ("the '277 patent"); U.S. Patent No. 6,854,287 ("the '287 patent"); U.S. Patent No. 6,862,179 ("the '179 patent"); and asserts that 29 claims of U.S. Patent No. 7,031,870 ("the '870 patent") (collectively, the "Asserted Patents") are indefinite. *See generally* Dkt. 133 ("Op. Br."). But Vertiv's asserted constructions are improper: each seeks to inappropriately limit the claims to a preferred embodiment or misapplies the rules of definiteness. The intrinsic and extrinsic records for all the patents show that there is no reason for the Court to limit the claim terms in the ways Vertiv has requested, and no purported indefiniteness issues support invalidating any claims. The Court should adopt Valtrus's proposed constructions.

## II.    ARGUMENT

### A.    U.S. Patent No. 6,718,277

#### 1.    "empirical atmospheric map" / "empirical thermal map" (claims 1, 12, 22)

| Vertiv's Proposed Construction | Valtrus' Proposed Construction |
|---|---|
| "visual representation of an are showing measured [atmospheric / temperature] conditions corresponding to locations" | Plain and ordinary meaning |

Vertiv assert that "empirical atmospheric map" / "empirical thermal map" should be construed to mean "visual representation of an area showing measured [atmospheric / temperature] conditions corresponding to locations." Op. Br. 5. Vertiv's construction is contrary to Federal Circuit law, the specification, the language of the claims, and the prosecution history, which all show that "empirical atmospheric/thermal map" should be given its plain and ordinary meaning.

As an initial matter, Vertiv's proposed construction was untimely disclosed and should not be considered. In each of its P.R. 4-2 and 4-3 disclosures, Vertiv contended that an "atmospheric map" should mean "**data displayable** as a visual representation of an area showing measured

atmospheric conditions corresponding to locations." Ex. A (4-2 Disclosures); Dkt. 117-1 (4-3 Disclosures) (emphasis added). Vertiv's expert applied the same construction and issued a 6-page opinion relating to it. Dkt. 133-1 ("Abraham Decl.") ¶¶ 112-125. Only now, in its opening brief, and without any explanation or notice (other than stating that this is a "minor clarification," Op. Br. 5 n.3), Vertiv has substantially changed its proposed construction by eliminating the term "data displayable." This gamesmanship is improper. The purpose of the claim construction process is to reasonably inform the parties, and the Court, of the parties' respective positions. *Seven Networks, LLC v. Google LLC*, 2018 WL 4501952, at *3 (E.D. Tex. July 11, 2018) ("[U]nilateral amendment or revision of disclosures, be they infringement contentions, invalidity contentions, ***or a party's position as to terms requiring construction by the Court***, is not to be permitted without leave of the Court.") (emphasis added). Vertiv never sought leave for its amended construction, and should not be allowed to change course now. Allowing Vertiv to, at the last moment, change its proposed construction, constitutes "trial by ambush," which is inapposite to the Federal Rules.[1] *Olivarez v. GEO Grp., Inc.*, 844 F.3d 200, 204 (5th Cir. 2016) (internal citations omitted).

Even if Vertiv's new proposed construction is considered, it should be rejected. Vertiv now asserts that "empirical atmospheric map" should mean "visual representation of an area showing measured atmospheric conditions corresponding to locations," but that is not what an empirical atmospheric map means. An empirical atmospheric map is just what it says it is—a map (*e.g.*, a correlation or compilation of data with location) that describes the empiric atmospheric conditions within an area. The same is true for the similar term, "empirical thermal map."

---

[1] Valtrus did not rely on expert testimony for this term, and made its decisions based on Vertiv's prior P.R. disclosures. Vertiv's change of position prejudiced Valtrus in determining its claim construction strategy and deprived it the opportunity to evaluate Vertiv's actual construction.

The '277 patent specification explains that its software creates a "map-like" set of information. Dkt. 133-2 ("'277 patent) 4:43. It does so by using software that "is capable of keeping track of the location of each atmospheric sensor such that the output of each can be '*mapped*.'" *Id.* 4:32-34 (emphasis added). The "thermal map is composed of temperature contours that define various isothermal regions" and can be used to "triangulate" hotspots. *Id.* 4:41-51. In other words, a "thermal map" is "map-like," *e.g.*, not necessarily a visual representation, it may be a compilation of a series of sensor data, and may be used to perform mathematical calculations like "triangulation." The specification also teaches that a map need not be measured and can instead be generated based on a mathematical model. *Id.* 4:25-27. The specification also discloses that, in some embodiments, "thermal map[s] *also* provide[] a powerful visual tool[.]" *Id.* 6:28.[2] The term "also" means what it says—in addition to other characteristics, it is *also* visual. But that does not mean the maps are *only* visual. In fact, the word "visual" is only used once in the specification and is not found in the claims. *See Id.* 8:10-10:45. All these disclosures are consistent with the plain and ordinary meaning.

Instead of grappling with these disclosures, Vertiv argues that this claim language should be limited to a singular embodiment ("visual"). Op. Br. 6. But Vertiv does not explain how mathematical functions could be performed on a purely visual representation. Nor can Vertiv convincingly argue that the applicant intended to limit a "thermal map" to this embodiment's characteristic. Absent explicit claim scope disclaimer, such a limitation is improper. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1323-24 (Fed. Cir. 2005) ("[A]lthough the specification often

---

[2] Vertiv misleadingly quotes this statement to omit the use of "also". *See* Op. Br. 6 ("Vertiv's construction is also consistent with the specification's description of the empirical thermal map as 'a **powerful visual tool** for a data center operator'…." (quoting '277 patent 6:28-35; emphasis in original).

describes by specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments."); *Thorner v. Sony Comput. Entm't Am. LLC*, 669 F.3d 1362, 1366-67 (Fed. Cir. 2012) ("It is likewise not enough that the only embodiments, or all of the embodiments, contain a particular limitation. We do not read limitations from the specification into claims; we do not redefine words. Only the patentee can do that. To constitute disclaimer, there must be a clear and unmistakable disclaimer.").

Vertiv argues that its proposed construction is correct because, during prosecution, the applicant "distinguished the claims from the Kiser reference by asserting that an 'empirical map of any sort is not disclosed anywhere in the Kiser document. . . . Kiser merely states that current conditions noted by sensors are received by a control unit periodically.'" Op. Br. 6 (quoting Dkt. 133-6 22-23; alternation in original). This is not a disclaimer of claim scope, but an explanation that Kiser does not disclose an ordering of the measured data against location, consistent with the plain and ordinary meaning of the word "map." The applicant did not say that the map had to be of any particular format (e.g., visual, digital, tabular), merely that a mapping had to be performed. This is far from the "unambiguous disclaimer" required by *Phillips* and its progeny. *See also e.g.*, *K-fee Sys. GmbH v. Nespresso USA, Inc.*, 89 F.4th 915, 924 (Fed. Cir. 2023) ("We conclude that [the reference] was distinguished not through any clear disavowal of claim scope, but because it was never within the scope of the claim.").

Additionally, the Examiner did not rely on the notion that an atmospheric map is a purely visual representation to allow the claim. Instead, the Examiner found the claim allowable because the prior art did not teach or suggest "generating an empirical atmospheric map from the results of said sensing step using software for processing input from said sensing step and for producing output in the form of said empirical atmospheric map." Dkt. 133-6 9-10. That statement is

consistent with the applicant's statement about Kiser—the prior art did not teach creating a map, it taught measuring conditions. There is no indication that either the Examiner or the applicant explicitly limited the word "map" to a "visual representation."

Accordingly, Vertiv's proposed construction should be rejected.

### 2. "template atmospheric map"/ "template thermal map" (claims 1, 12, and 22)

| Vertiv's Proposed Construction | Valtrus' Proposed Construction |
|---|---|
| "visual representation of an area showing model [atmospheric / temperature] conditions corresponding to locations" | Plain and ordinary meaning |

Vertiv asserts that "template atmospheric/thermal map" should be construed as "visual representation of an area showing atmospheric conditions corresponding to locations." Op. Br. 7. As with its construction of "empirical atmospheric map," Vertiv changed its position from its P.R. disclosures, and so the Court need not consider its arguments here. *See supra* p. 1-2; Ex. A; Dkt. 117-1; Dkt. 133-1 50-52. Even if considered, Vertiv's construction is incorrect: the specification and claim language indicate that "template atmospheric map" and "template thermal map" should be given their plain and ordinary meaning. In fact, the only disclosure that *any* map is "also" visual relates to the empirical, not the template, map. '277 patent 6:28, 6:34.

Vertiv argues that because the "template" map is compared with the "empirical" map, both must be in the same visual format. Op. Br. 8. But, as discussed in section A.1, the claim term "map" is not limited to a visual format and, similarly, there is no reason why a "template" map must be "visual." Even if an empirical map were visual, there is no requirement in the specification that both maps be in the same format to be compared, nor does Vertiv provide any evidence that supports this position.

Vertiv's proposal of including "model [atmospheric / temperature] conditions" in the definition is similarly unsupported and would improperly limit the invention to one of multiple

disclosed embodiments. *See Phillips*, 415 F.3d at 1323-24; *Thorner*, 669 F.3d at 1366-67. Instead, the specification supports the plain and ordinary meaning of the term. For instance, the specification discloses that "the template basically represents a thermal map of an optimally operating data center cooling system. The template can be dynamic, generated either in real-time ***from current operating conditions***, or can be static, generated prior to the comparing step." '277 patent 6:39-43 (emphasis added). The "template thermal map ***could also*** be termed a master, ***or*** model thermal map." *Id.* 6:38-39 (emphasis added). The use of the words "could also" and "or" indicate that these terms as separate and distinct embodiments. This makes sense because the thermal map can be determined based on "current operating conditions" or "could also" be a "model." Vertiv's reliance on the specification's disclosure that "C[omputational] F[luid] D[ynamics] modeling can be used to output a master, template, or model thermal map to be emulated by adjusting cooling system variables" to support its positions is also misplaced. Op. Br. 8. This section indicates that "master," "template," and "model" are all distinct embodiments of the map—which supports the plain and ordinary meaning.

Accordingly, Vertiv cannot overcome the "heavy presumption" that "model atmospheric map" should be given its plain and ordinary meaning. Its proposed construction should be rejected.

### 3. "comparing said empirical atmospheric map to a template atmospheric map" / "comparing said empirical thermal map to a template thermal map" (claims 1, 12, and 22)

| Vertiv's Proposed Construction | Valtrus' Proposed Construction |
|---|---|
| "comparing the empirical [atmospheric / thermal] map to a template [atmospheric / thermal] map, as distinguished from comparing sensed data representing current conditions to stored data representing desired conditions" | Plain and ordinary meaning |

Vertiv asserts that the terms "comparing said empirical atmospheric map to a template atmospheric map" and "comparing said empirical thermal map to a template thermal map" as

recited in claims 1 and 12, respectively, should be construed as "comparing the empirical [atmospheric / thermal] map to a template [atmospheric / thermal] map, as distinguished from comparing sensed data representing current conditions to stored data representing desired conditions."[3] But this construction is unnecessarily narrow and unsupported by either the specification or the prosecution history.

The specification supports the plain and ordinary meaning of the terms. The specification explains that "point specific temperature data is" first "converted into an empirical thermal map." '277 patent 6:1-3. Then, "pattern recognition software compares the empirical thermal map to a template thermal map." *Id.* at 6:36-38. The pattern recognition software is "applied to recognized pattern differentials [between the empirical and thermal maps]." *Id.* 6:60-62. "Pattern recognition is also commonly referred to as template matching, masking, etc." *Id.* 6:63-64. Further, the purpose of the pattern recognition is to "identify thermal spots" which "exceed a predetermined range of temperature, size, etc." *Id.* 6:66-7:2. "If all isotherms are within the predetermined range of temperature, size, etc, then the cooling system simply maintains current operating conditions." *Id.* 7:3-5. In other words, the pattern recognition software does three things: (A) it ingests the measured data and correlates a location and value for each measurement (e.g., generates a map), (B) it mathematically compares that map (which is a compilation of point specific sensed conditions) against a template map, and (C) based on the difference of those maps in specific locations (e.g. based on the "size or temperature measured") adjusts the atmospheric control settings. Therefore, the specification contemplates comparing the compilation of point-specific

---

[3] For ease, this section refers to both "comparing said empirical atmospheric map to a template atmospheric map" and "comparing said empirical thermal map to a template thermal map" as recited in claims 1, 12, and 22 as "comparing said empirical atmospheric map to a template atmospheric map" as Vertiv also does. Op. Br. 8-9.

data ("thermal map") against the template point specific data compilation ("template map") in order to control the data center. Vertiv does not contend with these disclosures or explain how this mathematical pattern recognition indicates a purely visual process.

Instead, Vertiv argues that "template matching" is an image-based technique and therefore the claim term should be limited to a visual comparison. Op. Br. 9. As an initial matter, Vertiv does not cite any evidence—intrinsic or extrinsic—to support its conclusion. But even assuming Vertiv's understanding of "template matching" is correct, it is still only one embodiment of the process. The specification also discloses that the comparison could be "masking" and other comparative measures ("etc.") which are not described as image based. Vertiv simply ignores these terms.

Vertiv also misconstrues the '277 patent's prosecution history, arguing that "the applicant expressly disclaimed "methods involving a direct comparison of data representing sensed conditions at a sensor location to stored desired conditions for that location." Op. Br. 10. The applicant made no such disavowal. Instead, the applicant distinguished the prior art because it did not "disclose the generation of an empirical map" or compare an empirical map with a template map; instead it "discusse[d] that the current condition received from the sensors is entered into a computer memory and is 'compared to stored data representing the desired condition at that location.'" Dkt. 133-6 24. That means what it says—that Kiser did not disclose comparing an empirical map with a template map. The applicant's statement did not mean that the individual data within the empirical map is not compared with the template data, or that the two maps were exclusively in a visual format.

Therefore, both the specification and prosecution history support construing this claim term to have its plain and ordinary meaning.

### 4.     "pattern differentials" (claims 1, 12, and 22)

| Vertiv's Proposed Construction | Valtrus' Proposed Construction |
|---|---|
| "differentials in patterns formed in a comparison between the empirical [atmospheric / thermal] map and the template [atmospheric / thermal] map, as distinguished from differences detected by a comparison of sensed current conditions to stored desired conditions" | Plain and ordinary meaning |

Vertiv asserts that "pattern differentials" as described in claims 1, 12, and 22 should be construed as "differentials in patterns formed in a comparison between the empirical [atmospheric / thermal] map and the template [atmospheric / thermal] map, as distinguished from differences detected by a comparison of sensed current conditions to stored desired conditions." Contrary to Vertiv's narrowing construction, the specification and prosecution history support a plain and ordinary construction.

The specification discloses that, once the empirical map is created (as discussed in section A.3), then the pattern recognition software recognizes "pattern differentials" between the empiric and template maps. '277 patent 6:61-62. This includes the detection and characterization of isotherms that "exceed a predetermined range of temperature, size, etc." *Id.* 6:66-7:1 The software then adjusts the conditions in the data center to "eliminate or at least reduce pattern differentials" as evidenced by "thermal map data, such as the location, size, and intensity of the isotherms." These "data sets are correlated to optimally efficient course of action." *Id.* 7:14-16. In other words, the software finds pattern differentials, e.g. recognizable differences, between the thermal map data, including location and temperature, and seeks to eliminate these differences. Vertiv does not discuss this disclosure, or any parts of the specification to support its proposed construction.

Vertiv also misconstrues the prosecution history by asserting that the applicant "relinquished claim coverage involving a comparison of sensed conditions at a specific location to

stored desired conditions at that same location" by arguing that "'[t]he pattern differential cited in these claims pertain to differentials in patterns formed in a comparison between the generated empirical map and the template empirical map.'" Op. Br. 11 (citing Dkt. 133-6 at 25). This is not a disclaimer of claim scope, but an explanation that Kiser does not disclose determining pattern differentials through a comparison of two compilations of location coordinated data (e.g., "map").

Because the specification and the prosecution history do not support Vertiv's proposed construction, the term should be given its plain and ordinary meaning.

**B.    U.S. Patent No. 6,854,287**

**1.    "A method for cooling a room configured to house a plurality of computer systems" (claim 1)**

| Vertiv's Proposed Construction | Valtrus' Proposed Construction |
|---|---|
| Not limiting | Limiting |

Vertiv assert that the preamble reciting "a method for cooling a room configured to house a plurality of computer systems" is not limiting because this phrase supposedly only provides "context" for the claimed method and "the body of claim 1 recites a complete and self-contained method." Op. Br. 12-13. Vertiv is incorrect—the context of the claims and specification indicate the preamble is structurally and linguistically important because it provides antecedent basis to various portions of the claim, and is therefore limiting under controlling precedent.

Claim 1 of the '287 patent recites, in full:

1[pre] A method for cooling *a room* configured to house a plurality of computer systems, said method comprising:

1[a] providing a plurality of heat exchanger units configured to receive air from *said room* and to deliver air to *said room,*

1[b] supplying said plurality of heat exchanger units with cooling fluid from an air conditioning unit;

1[c] cooling said received air through heat exchange with the cooling fluid in the plurality of heat exchanger units,

10

1[d] sensing temperatures at one or more locations in **said room**,

1[e] controlling at least one of the temperature of said cooling fluid and said air delivery by said plurality of heat exchanger units to **said room** in response to said sensed temperatures at said one or more locations, and

1[f] wherein the step of controlling said air delivery by said plurality of heat exchanger units comprises individually manipulating a mass flow rate of the cooling fluid supplied to each of the plurality of heat exchanger units.

Dkt. 133-3 ("'287 patent") 14:16-37 (emphasis added). The claimed structural limitation "said room" in steps 1[a], 1[d], and 1[e] all derive antecedent basis from the preamble, "[a] method for cooling a room configured to house a plurality of computer systems." Consistent with the '287 patent—which is directed to cooling of data centers ("defined as a location, e.g., room, that houses computer systems arranged in a number of racks," '287 patent 1:23-25)—the preamble of claim 1 recites essential structure and provides antecedent basis for the remainder of the claim. *See, e.g., Shoes by Firebug LLC v. Stride Rite Children's Grp., LLC*, 962 F.3d 1362, 1368 (Fed. Cir. 2020) (finding preamble limiting "[b]ecause the claim requires that the illumination system be housed in the textile footwear recited in the preamble, the preamble is essential to understanding the structural limitations of the illumination system."); *Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002) ("In general, a preamble limits the invention if it recites essential structure or steps, or if it is necessary to give life, meaning, and vitality to the claim.") (cleaned up).

Vertiv asserts that "a room configured to house a plurality of computer systems" is merely a potential environment or intended use, not a structural limitation. Not so. In claim 1, the preamble provides necessary structural antecedent basis for a key term ("room") and provides a structure around which other key elements—heat exchangers (which are configured to receive air from and

send air to the room), and cooling fluid and air, whose temperatures are modulated based on the temperature measured in the room—are described. *Shoes by Firebug LLC*, 962 F.3d 1362 at 1368.

The specification also clarifies that the "room" is a necessary structure, and not just the context in which the method is performed. For instance, the specification discloses that the room's temperature is of great significance and that optimization of data center cooling requires an analysis of the "cooling requirements of a room configured to house computer systems." '287 patent 12:52-53. This analysis can lead to an optimized layout of components within the room. *Id.* 7:58-7:65. In fact, the specification discloses that "[i]t should also be understood that the specific configuration for any given room may depend upon a multitude of factors, e.g., cooling needs, room configuration, cooling device type, etc." *Id.* 7:58-62. The shape, size, and dimension (all structural features) of the room necessarily play a role in the optimization strategy. *Id.* The specification also describes other structural components, like the "cooling device," in relation to the room. *Id.* 5:40-44 ("[a]lthough the cooling device 24 is illustrated as being located outside of the room 10, it should be understood that the cooling device 24 may be positioned within the room").

Vertiv is also incorrect that the prosecution history supports its position. That the preamble was not used to distinguish the invention of claim 1 from prior art is logical (and has no bearing on this issue) because the Examiner found that the prior art explicitly disclosed a "room." Dkt. 133-8 12. Instead, the Applicant amended claim 1 to disclose a "plurality of heat exchanger units" thereby distinguishing claim 1 from the cited prior art. *Id.* 3, 5.

Vertiv also cites *Symantec Corp. v. Comput. Associates Int'l, Inc.,* 522 F.3d 1279, 1288 (Fed. Cir. 2008) to argue that failing to use a preamble during prosecution "weighs heavily" against finding the preamble limiting. Op. Br. 14. But *Symantec* does not say that. Instead, it provides that

12

"absent clear reliance on the preamble in the prosecution history, **or in situations where it is necessary to provide antecedent basis for the body of the claim**, the preamble generally is not limiting." *Symantec,* 522 F.3d 1279 at 1288 (emphasis added). Vertiv simply ignores the latter alternative part of *Symantec*'s decision.

Vertiv's expert offers an entirely conclusory assessment regarding the "inventive aspect of the claim" and the effect of the prosecution history. Abraham Decl. ¶163. This opinion should be afforded no weight. *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 332 (2015) ("[E]xperts may be examined to explain terms of art, and the state of the art, at any given time, but they ***cannot*** be used to prove the proper or legal construction of any instrument of writing.") (cleaned up, emphasis added). Accordingly, the court should find that the preamble is limiting.

### 2. "an air conditioning unit" (claims 1-2, 7-8, 10, 14, 16, 18, 20-21)

| Vertiv's Proposed Construction | Valtrus' Proposed Construction |
|---|---|
| "a single air conditioning unit" | Plain and ordinary meaning |

Vertiv asserts that "an air conditioning unit" as used in the claims of the '287 patent should be construed to mean "a single air conditioning unit." Op. Br. 14. But Vertiv is incorrect: relevant Federal Circuit law, the structure of the claims, the specification, and the prosecution history all militate that "an air conditioning unit" should be given its plain and ordinary meaning.

Vertiv admits that "[a]s a general rule, the words 'a' or 'an' in a patent claim carry the meaning of 'one or more.'" Op. Br. 14 (citing *Rehco LLC v. Spin Master, Ltd*., 759 F. App'x 944, 949 (Fed. Cir. 2019) (internal citations and quotations omitted)). "The exceptions to this rule are extremely limited: a patentee must evince a clear intent to limit 'a' or 'an' to 'one.'" *Baldwin Graphic Sys., Inc. v. Siebert, Inc.*, 512 F.3d 1338, 1342 (Fed. Cir. 2008) (cleaned up). But Vertiv does not—and cannot—point to any clear intent to limit the scope of the claims.

Vertiv first argues that the structure of the claims indicates that "an" is singular because later recitations of "air conditioning unit" are preceded by the definite article "said" or "the." Op. Br. 14-15. The Federal Circuit has already rejected this argument, making clear that the use of a subsequent definite article "reinvokes [the] non-singular meaning." *01 Communique Lab'y, Inc. v. LogMeIn, Inc.*, 687 F.3d 1292, 1297 (Fed. Cir. 2012) ("The subsequent use of definite articles 'the' or 'said' in a claim to refer back to the same claim term does not change the general plural rule, but simply reinvokes that non-singular meaning.").

Vertiv then argues that because other claims disclose a "plurality of heat exchanger units" or "a plurality of valves," the applicant implicitly disavowed the plural meaning of "a." Op. Br. 15-16. This argument similarly lacks merit. Where "a" means "one or more," "'a plurality of' means 'at least two.'" *SIMO Holdings Inc. v. Hong Kong uCloudlink Network Tech. Ltd.*, 983 F.3d 1367, 1377 (Fed. Cir. 2021). Vertiv twists these terms to imply that because some limitations required "two or more," limitations reciting "a" must mean "one." But that conclusion lacks a logical basis. The claim language is clear: in some cases, the applicant claimed "two or more" ("a plurality of"), and in some cases the applicant claimed "one or more" ("a"), which are both congruent with the plain and ordinary meaning of the terms.

Vertiv then argues that the specification supports a disavowal of the plural claim scope by pointing to particular embodiments. Op. Br. 16-17. As an initial matter, an infringer cannot overcome the "heavy presumption" that a claim term carries its plain and ordinary meaning "simply by pointing to the preferred embodiment or other structures or steps disclosed in the specification or prosecution history." *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1327 (Fed. Cir. 2002). Additionally, the specification provides multiple embodiments that all indicate the presence of one or more air conditioners. In fact, the specification explicitly contemplates using

14

"one or more air conditioning units." *Id.* 1:63-64 ("data centers are typically cooled by operation of **one or more air conditioning units**"), 2:17-20 ("**air conditioning systems** are typically designed around the maximum capacity and redundancies are utilized so that the data center may remain on-line on a substantially continual basis.") (emphases added).

Finally, Vertiv asserts that the prosecution history "reinforces Vertiv's construction" because the claims were amended to recite "a plurality of heat exchangers" but kept "an air conditioning unit." Op. Br. 17. This supposedly demonstrates the applicant's intent to claim a single air conditioning unit. But choosing to amend the claims to recite "a plurality of heat exchangers" does not affect the meaning of "an air conditioning unit." Instead, it means just what it says—that the claim, as amended, requires "more than one" ("plurality of") heat exchanger units but could comprise "one or more" ("a") air conditioners. There is simply no indication that the applicant sought to limit the term "an air conditioning unit." Absent "a clear disavowal of claim scope" the term should be given its "plain and ordinary meaning." *Teleflex*, 299 F.3d at 1327.

Vertiv's reliance on its expert to support its position is similarly misplaced. Dr. Abraham simply recites the claim language and offers a conclusory opinion about what it means, which is not helpful testimony. Op. Br. 14 n. 4; *Teva Pharm. USA, Inc.*, 574 U.S. 318 at 332. Accordingly, the term should be afforded its plain and ordinary meaning.

C.    **U.S. Patent No. 6,862,179**

1.    **"cooling fluid" (claims 1-4, 6-9, 13-22, 25-28, 32-36, 40)**

| Vertiv's Proposed Construction | Valtrus' Proposed Construction |
|---|---|
| "fluid that cools data center racks" | Plain and ordinary meaning |

Vertiv asserts that the term "cooling fluid" should be construed to mean "fluid that cools data center racks." Op. Br. 18. None of the plain meaning of this phrase, the specification, nor the claims support Vertiv's position.

Vertiv wants to limit "cooling fluid" to a particular functionality (cooling data center racks). But that is not what cooling fluid means—cooling fluid, as the name implies, refers to any fluid that can be used in cooling. Vertiv cites no contrary definition. Nor do the specification or claims support Vertiv's position or equate "cooling fluid" with "fluid that cools data center racks." Rather, the '179 patent repeatedly explains that "cooling fluid" should carry its ordinary meaning and repeatedly gives examples of uses beyond just data center racks.

For example, the '179 patent specification describes cooling fluid as "air, other gasses, liquid, etc." Dkt. 133-4 ("'179 patent") 2:66-3. Similarly, the specification discloses that the cooling fluid flows through vents configured to "control the velocity and the volume flow rate of air." *Id.* 5:30-37. How "air," which the specification explicitly calls out, or "vents" fall within Vertiv's definition of fluids that cool data center racks is unclear.

The specification also discloses that the cooling fluid is not just limited to the cooling of racks. The specification discloses that cooling fluid may be used to cool racks, zones, components, and areas of a data center. *Id.* 3:66-4:4, 2:25-26 ("the controllable partition is manipulated to vary the supply of the cooling fluid to the ***zone***"); 1:66-67 ("cooling fluid is supplied to the ***components***"), 3:11-16 ("More specifically, by modifying the volume flow rate of cooling fluid from a plenum … an ***area of the data center*** may receive cooling capacity commensurate with the heat load dissipated within that area.") (all emphases added).

The claims themselves similarly support the plain and ordinary meaning of the term. For instance, claim 1 discloses that a method for cooling racks in a data center includes cooling a zone by "opening a controllable partition" which can be manipulated to "vary" the "supply of...cooling fluid to said zone." *Id.* 18:37-43. In claim 1, there is no indication that the cooling fluid is limited to only cooling the racks. Instead, the claim discloses that the flow of cooling fluid is changed by

16

a controllable partition based on the temperature of the system. The language of the claim only limits the way in which the supply of cooling fluid is varied, not its intended use. Moreover, the plain language of the claim indicates that the cooling fluid, which flows to the zone, could cool the zone (as well as any components within the zone, including racks).

Vertiv next argues that because one embodiment of the invention uses cooling fluid to cool racks, the term cooling fluid must be limited to that use. Op. Br. 19-20. But the Federal Circuit has made clear that limiting the claim language to a singular embodiment is inappropriate. *Phillips*, 415 F.3d at 1323–24 ("[A]lthough the specification often describes by specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments."). And doing so would ignore the teaching of the specification, including using cooling fluid to cool zones, components, racks, and areas of the data center.

Finally, Vertiv argues that because the specification indicates that "chilled water" may be used to cool cooling fluid, that "cooling fluid" is distinguished from other "refrigerants" like chilled water. Op. Br. 21. But the specification does not equate "chilled water" exclusively with refrigerants. Instead, the specification indicates that "chilled water" may be used in a cooling system. '179 patent 4:45-60. Further, Vertiv attempts to draw a barrier around the terms "refrigerant" and "cooling fluid" where no barrier exists. The specification does not teach that a "refrigerant" is not a type of "cooling fluid" or vice versa. Instead, the specification merely discloses that "refrigerant" is compressed by compressors in a cooling system. *Id*. Similarly, the specification does not disclose that "chilled water" is not a cooling fluid. Instead, the specification discloses that "chilled water heat exchangers" may be used to extract heat from cooling fluid. *Id*. 4:59, 6:18. That functionality is entirely congruent with the plain and ordinary meaning of a cooling fluid—a fluid that can be used to cool. Common sense and a plain reading of the

17

specification both dictate that chilled water, a liquid, is cooling fluid. Vertiv's attempt to argue otherwise finds no support within the specification.

In view of these specification disclosures, Vertiv's proposed construction—constituting a portion of an embodiment—is improper and should be rejected. *See EPOS Techs. Ltd. v. Pegasus Techs. Ltd.*, 766 F.3d 1338, 1341 (Fed. Cir. 2014) ("[I]t is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited."); *Phillips*, 415 F.3d at 1323–24.

### 2. "controllable partition" (claims 1, 9, 16, 22, 27, 29-31, 37-41)

| Vertiv's Proposed Construction | Valtrus' Proposed Construction |
| --- | --- |
| "a barrier that subdivides a space into zones and is manipulable to vary a supply of cooling fluid to a zone" | "a 'controllable partition' cannot be a 'vent'" |

The parties agree that Valtrus' proposed construction is correct. Op. Br. 23 ("Vertiv agrees that controllable partitions do not encompass vents . . . ."). But Vertiv seeks to further limit the term "controllable partition" to one specific embodiment. None of the plain meaning of this claim phrase, the claims, or the specification support Vertiv's attempt to read additional limitations into this otherwise unambiguous claim phrase.

Vertiv wants to limit a "controllable partition" to a particular structure, namely a "barrier that subdivides a space into zones and is manipulable to vary a supply of cooling fluid to a zone." Op. Br. 23. But that is not the only thing "controllable partition" can mean—the patent makes clear it refers to a variety of structures that that can be controlled for different purposes, and there is no clear disclaimer or lexicography otherwise limiting the phrase.

The specification does not support Vertiv's position or equate "controllable partition" exclusively with "a barrier that subdivides a space into zones and is manipulable to vary a supply

18

of cooling fluid to a zone." Rather, the specification is consistent: "controllable partition" caries its plain meaning and is not inherently limited to "subdividing a space into zones and is manipulable to vary a supply of cooling fluid to a zone." Vertiv argues that the specification discloses that "a plurality of partitions 22a-22j (e.g. barriers, walls, etc.)" means that the specification intended for a partition to be limited to a barrier or wall. As an initial matter, Vertiv ignores that this quotation leaves open additional embodiments ("etc.") which indicates that invention is not limited to "barrier" or "walls," but that these are simply two examples of a controllable partition. Similarly, the specification discloses that there are "various embodiments" and in these embodiments, controllable partitions may include "louvered, rotating and/or retractable partitions."'179 patent 4:24-31. Vertiv's failure to explain how limiting a partition to a "barrier or wall" allows for the partitions to be louvered or rotate dooms the proposed construction.

The claim language also supports a plain and ordinary meaning. For instance, claim 29 discloses that a "controllable partition is comprised of a plurality of louvers." *Id.* 23:1-3. Similarly, claims 30 and 31 disclose that a "controllable partition is operable to rotate" and that a "controllable partition is operable to retract and elongate," respectively. *Id.* 23:4-5; 23:6-7. Like the specification, the claim language indicates that a variety of structures, e.g., louvered, rotatable, and retractable structures may be controllable partitions, which Vertiv's proposed construction does not account for.

Vertiv goes on to argue that controllable partition should additionally be limited to a structure used to "manipulable to vary a supply of cooling fluid to a zone." Op. Br. 22-23. Nothing in the specification or claims indicates that "controllable" should be limited to this functionality. Instead, the partitions may be controlled by "any suitable actuating device" including "motors" and "electromagnetic, pneumatic, and like devices," consistent with the plain and ordinary

meaning of the term. '179 patent 4:38. Nor should "controllable partition" be limited to one purpose. For instance, claim 1 recites "a controllable partition configured to vary a supply of cooling fluid within a zone of said data center." *Id.* 18:39-41. That the inventor clarified that one configuration for a controllable partition is to "vary a supply of cooling fluid within a zone of said data center" implies that other configurations are also available. Otherwise, there would be no reason for the inventor to claim that specific configuration.[4] In view of these disclosures, Vertiv's proposed construction—constituting a portion of an embodiment—is improper and should be rejected. *See EPOS Techs. Ltd.*, 766 F.3d at 1341; *Phillips*, 415 F.3d at 1323–24.

On the other hand, Valtrus' proposed clarification—"a 'controllable partition' cannot be a 'vent'"—is supported by the specification, prosecution history, and the language of the claims—as even Vertiv agrees. The specification of the '179 Patent consistently describes and depicts partitions and vents as being separate. For example, the patent explains that "[i]n addition to controlling the flow of cooling fluid by controlling the [Controllable Partition] 26f, it is within the scope of the invention that flow of cooling fluid may also be controlled by the manipulation of dynamically controllable vents." '179 Patent 5:30-33 (emphasis added). The patent also discloses the interplay between a "vent" and a "controllable partition:" "[i]n another example, the baffle 62 may be controlled to direct the flow of cooling fluid upwards (e.g., out of a vent 24a-26h) or downwards (e.g., to increase the flow towards a partition 26a-26f)." *Id.* 8:19-23 (emphasis added). That a "vent" and "partition" are different is consistent throughout the specification. *See also, e.g., Id.* 4:16-39 (separately describing "vents 24a-24h" and "controllable partitions ('CPs') 26a-26f"),

---

[4] Moreover, substituting the term "manipulable to vary a supply of cooling fluid to a zone" would cause claim 1 to recite "a barrier that subdivides a space into zones and is manipulable to vary a supply of cooling fluid to a zone configured to vary a supply of cooling fluid within a zone." This obvious and illogical redundancy indicates that this could not be the correct understanding of the term "controllable partition."

5:2-18 (same), 17:46-50, 16:15-25, 16:30-36, FIGs. 1, 2A (separately depicting vents 24a-h and controllable partitions 26a-26f), FIG. 5 (separately depicting vents 24a-h and controllable partitions 26a-26f and 508).

The prosecution history further confirms that a "controllable partition" is not a "vent." During prosecution, the Examiner issued an initial office action rejecting all the pending claims. Ex. B (Excerpted File History), 35-36. The sole reason for this rejection was the Examiner's assertion that the claims were obvious under the judicially created double patenting doctrine over U.S. Patent No. 6,694,759 ("Bash"). *Id.* The specification of Bash discloses that vents 12a and 12b (i) can be used to "modulate the flow of cooling fluid flowing" in "chamber 48b," (ii) may be used to adjust the cooling fluid in the plenum to the "cooling requirements of the racks 20a-20b," and (iii) are horizontally disposed between the racks 20a-20c and allow for air to pass directly from the plenum to the rack area. Ex. C ("Bash") 8:1-22.

During prosecution of the '179 Patent, the Applicant argued, among other things, that the pending claims were patentably distinct from Bash because pending claim 1 "pertains to manipulation of a controllable partition in response to sensed temperatures at an associated rack" whereas claim 1 of Bash "pertains to actuation of an automatically adjustable vent in response to detected pressure in a plenum." Ex. B (Excerpted File History), 30-31. In response, the Examiner allowed the claims based on this clarification. *Id.* 1-3.

Third, the doctrine of claim differentiation and the presumption that different claim terms have different meanings additionally clarify that a "controllable partition" is not a "vent." *Wenger Mfg., Inc. v. Coating Mach. Sys., Inc.,* 239 F.3d 1225, 1233 (Fed. Cir. 2001) ("each claim in a patent is presumptively different in scope."); *Karlin Tech. Inc. v. Surgical Dynamics, Inc.,* 177 F.3d 968, 972 (Fed. Cir. 1999) (internal citations omitted) ("This doctrine, which is ultimately

based on the common sense notion that different words or phrases used in separate claims are presumed to indicate that the claims have different meanings and scope, normally means that limitations stated in dependent claims are not to be read into the independent claim from which they depend.")

Independent claim 1 of the '179 Patent recites "activating a cooling device and opening a controllable partition…" '179 Patent 18:39-40, 18:48-49. Dependent claim 7—which depends from claim 4, which depends from claim 1—further recites "opening a plurality of vents, said vents being configured to supply cooling fluid to said racks," "controlling one or more of said plurality vents to decrease the supply of said cooling fluid…," and "controlling said one or more vents to increase the supply of said cooling fluid…." *Id.* 19:16-17, 19:19-20, 19:24-25. Thus, the doctrine of claim differentiation also supports Valtrus' construction, since the dependent claims differentiate vents from controllable partitions.

Moreover, the use of different claim terms—"vent" and "controllable partition"—in the claims, consistent with the usage in the '179 patent specification and prosecution history, evidences that they are different. *See, e.g.*, *Augme Techs., Inc. v. Yahoo! Inc.*, 755 F.3d 1326, 1333 (Fed. Cir. 2014) (different claim terms are presumed to have different meanings); *CAE Screenplates Inc. v. Heinrich Fiedler GmbH & Co.*, 224 F.3d 1308, 1317 (Fed. Cir. 2000) ("In the absence of any evidence to the contrary, we must presume that the use of these different terms in the claims connotes different meanings.").

In fact, Vertiv's own expert apparently agrees with Valtrus that a "controllable partition" is not a "vent." Abraham Decl. ¶ 149 ("I agree that the meaning of "controllable partition" does not encompass a vent"). Thus, the Court should hold that a "controllable partition" is not a "vent," while rejecting Vertiv's attempt to narrow the claim to the specification's embodiments.

### 3. "movable device configured to detect at least one environmental condition at various locations of said data center" (claims 9 and 22)

| Vertiv's Proposed Construction | Valtrus' Proposed Construction |
|---|---|
| "a device operable to travel to various locations within a data center to detect at least one environmental condition at the various locations" | Plain and ordinary meaning |

Vertiv asserts that a "movable device" should be limited to "a device operable to travel to various locations within a data center." Op. Br. 24. But that is not what "movable device" means—it means a device that is able to be moved. Vertiv cites nothing in the record to suggest it should be understood differently from this plain meaning, which will be clear to a jury. Instead Vertiv argues that a "movable device" should be limited to one embodiment that is incorporated by reference into the specification. Op. Br. 24-25. But that is improper absent the clear intent of the applicant, which is not present here. *See EPOS Techs. Ltd.,* 766 F.3d at 1341.

First, the specification supports that "movable" in the claims carries its plain and ordinary meaning. For instance, it states that "the number of temperature sensors and the temperature measurements of the number of racks may be upgradable, e.g., scalable, to include any additional components and/or racks that may be included in the data center 10. In addition, the temperature sensors ***need not be stationary*.**" '179 Patent 9:2-6 (emphasis added). Therefore, in some embodiments, the sensors are "not stationary" (and therefore movable) and that the "number" and "components" are "scalable" and can "include any additional components" suitable for a data center. In other embodiments, the specification discloses a "mobile device" that can "travel around the racks." *Id.* 9:7-11.

Second, the language of the claims does not indicate that a "movable" device is properly limited to a "mobile device." For instance, claim 9 recites "receiving temperatures from a movable device configured to detect at least one environmental condition at various locations of said data

center." *Id.* 19:43-45. Claim 21 similarly recites "receiving temperatures from a movable device configured to detect at least one environmental condition at various locations." *Id.* 9:56-59. Neither of these claims indicate that the "movable device" should be limited to a semi-autonomous mobile device ("mobile device"), as Vertiv argues. Op. Br. 25-26. If the applicant had wished to make this limitation, it would have claimed a "mobile" or "semi-autonomous" device, not just a "movable" one.

Vertiv's proposed construction is improper and should be rejected.

**D.    U.S. Patent No. 7,031,870**

**1.    "calculate/calculating indices of air re-circulation" terms (claims 1-5, 7-25, 27-41 )**

| Vertiv's Proposed Construction | Valtrus' Proposed Construction |
|---|---|
| Indefinite | Not indefinite. Plain and ordinary meaning. |

Vertiv asserts that all the "calculate indices of air re-circulation" terms are indefinite because they allegedly "fail to inform with reasonable certainty" about the scope of the invention. Op. Br. 27. Vertiv hinges its argument on the flawed notion that, to be definite, a claim must list every manner in which a value may be calculated. That is not the standard for definiteness.

"Definiteness is to be evaluated from the perspective of a person skilled in the relevant art, [and] claims are to be read in light of the patent's specification and prosecution history[.]" *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 899 (2014). A claim, when viewed in light of the intrinsic evidence, must "inform those skilled in the art about the scope of the invention with reasonable certainty," if it does not, then it is invalid as indefinite. *Id.* at 910, 901; *Seagen Inc. v. Daiichi Sankyo Co.*, 2021 WL 4168660, at *3 (E.D. Tex. Sept. 14, 2021). It is the moving party's burden to show, by "clear and convincing evidence," that the claim is indefinite. *BASF Corp. v. Johnson Matthey Inc.*, 875 F.3d 1360, 1365 (Fed. Cir. 2017). Vertiv has failed to meet its burden. When read in the context of the claims and the specification, the challenged terms are definite.

Claim 1[5] recites a method for evaluating components in a data center that includes:

[1pre] A method for evaluating one or more components in a data center, the method comprising:

[a] detecting inlet and outlet temperatures of one or more heat dissipating devices;

[b] detecting temperatures of air supplied by one or more computer room air conditioning (CRAC) units;

[c] calculating indices of air re-circulation for the one or more heat dissipating devices based upon the detected inlet temperatures, outlet temperatures and supplied air temperatures;

[d] varying a flow field setting of air delivered to the one or more heat dissipating devices;

[e] determining whether the indices of air re-circulation has changed in response to the varied flow field settings; and

[f] evaluating the one or more components based upon changes in the indices of air re-circulation for the one or more heat dissipating devices at the various flow field settings.

Dkt. 133-5 ("'870 patent") 20:15-34.

To perform this evaluation, [a] the method first detects inlet and outlet temperatures of heat dissipating devices and [b] temperatures of air supplied to air conditioning units. Then, [c] using those measured values, indices of air re-circulation for the heat dissipating devices are calculated. Then the [d] flow of the air delivered to the devices is changed, and the [e] indices of air re-

---

[5] Claims 13, 22, 32, and 37 all similarly claim calculating indices of air re-circulation, changing the flow field settings, and comparing the indices of air re-circulation after the change in flow field with the indices of air re-circulation before the change in flow field settings. Dkt. 133-5 ("'870 patent") 22:10-23; 23:40-49; 32:9-15; 26:5-10. However, claims 1, 13, and 22 all additionally recite that the indices are calculated based on "detect[ed] inlet and outlet temperatures" of "heat dissipating devices" and the supply temperature—an additional reason to find that these three claims are definite. *Id.* 20:18-21; 22:10-19; 23:40-48; Ex. D ("Pokharna Decl.") ¶¶ 40, 84; Dkt. 133-12 ("Pokharna Tr.") 50:12-51:5 (A POSITA would understand that if a formula is "based on the [inlet, outlet, and air supply] temperatures, and …can change because of re-circulation" then that formula falls within the limitation of "indices of air re-circulation.").

circulation after this change are compared with indices measured before the change. Finally, the components are [f] evaluated based on how the indices of air re-circulation changed at the various flow settings. There is nothing indefinite about the claim.

As an initial matter, there is no confusion about what "calculating indices of air re-circulation" means (and Vertiv does not assert that a POSITA would not understand the term). *See* Op. Br. 28; Pokharna Decl. ¶ 37. For instance, the specification discloses that SHI is the "measure of the infiltration of heated air into the cooled air" and can be calculated using the following equation: $(SHI)_i = \frac{dQ}{Q+dQ}$ "[w]here Q represents the heat dissipation from all the components in the rack (i) and dQ represents the rise in enthalpy of the cooled air before entering the rack (i)." '870 patent 8:56-57, 8:54-67; Pokharna Decl. ¶ 46. Because these values are, amongst other things, difficult to measure, the specification discloses a different method of calculating SHI which may further be represented as a function of the inlet and outlet temperatures of an individual rack (i): $(SHI)_i = \left(\frac{T_{in}-T_{ref}}{T_{out}-T_{ref}}\right),$ '870 Patent 9:25-30, "where $T_{in}$ and $T_{out}$ are the inlet and outlet temperatures of rack (i) and $T_{ref}$ denotes the vent tile air supply temperature which may be equivalent to the supply air temperature of the CRAC unit" that is "closest in proximity to the rack (i)." *Id.* 9:7-14; Pokharna Decl. ¶¶ 46-47.

Vertiv also does not debate that the disclosure of U.S. Patent No. 7,051,946, Dkt. 133-11 (the "'946 Patent"), is part of the intrinsic record and fully incorporated into the '870 patent. Op. Br. 29; *X2Y Attenuators, LLC v. U.S. Int'l Trade Comm'n,* 757 F.3d 1358, 1362–63 (Fed. Cir. 2014) (patents that are incorporated by reference are "effectively part of the host [patents] as if [they] were explicitly contained therein."). The '946 patent discloses an additional example of an index of air re-circulation, RHI—the return heat index. *See generally* '946 patent. Like SHI, RHI is calculated based upon temperatures measured at various locations throughout the data center

and RHI "may act as [an] indicator[] of thermal management and energy efficiency" of components in a data center. *Id.* 4:41-42, 4:37-39, 12:25-43, 12:58. RHI, like SHI, can be calculated as a ratio of enthalpy change. *Id.* at 12:25-43, equation 7; Pokharna Decl. ¶ 58, Op. Br. 9. Therefore, the intrinsic record discloses two indices of air re-circulation and how to calculate them.

Second, the claims also provide guidance on how indices of air re-circulation may be calculated. For instance, claims 6 and 26 both disclose that an index of air re-circulation may be calculated using the following formula: $(SHI)_i = \left(\frac{T_{in} - T_{ref}}{T_{out} - T_{ref}}\right)$. '870 patent 20:65-21:10, 24:8-21. These specific examples from the claims provide guidance about the scope of the "indices of air re-circulation." Pokharna Decl. ¶¶ 40-43. Vertiv argues that the doctrine of claim differentiation implies that the scope of the term "indices of air re-circulation" cannot be limited to this one equation. Op. Br. 28-29. But Valtrus does not assert that the scope is so limited—the specification clarifies that RHI would similarly fall in the scope of the claims—but instead that the examples in the dependent claims help provide clarity and context for the claim scope. *See Geoscope Techs. Pte. Ltd v. Apple Inc.*, 2023 WL 4629539, at *10 (E.D. Va. July 19, 2023) (rejecting indefiniteness argument because the dependent claims "provide a POSA with specific examples" of what term in independent claim encompasses).

Vertiv's indefiniteness argument appears to rest solely on the premise that the independent claims "do not indicate which equation to use," which makes them *per se* indefinite. But read in context, the scope of the claims (and the boundaries of infringement) are clear and there is no such *per se* rule. The claims are directed at comparing indices of air re-circulation before and after a change in flow field settings and then evaluating components of a data center based on that comparison. Pokharna Decl. ¶¶ 76-77, 92. Which formula is used to calculate the indices of air re-

circulation is irrelevant to the question of infringement. *Id.* ¶ 92. The claims merely require that the infringer use *some* formula based on the input, output, and supply temperatures to calculate indices of air re-circulation and compare those indices with indices measured after a change in air flow field settings to evaluate data center components. Pokharna Decl. ¶¶ 79-80, 83, 91-92 Vertiv ignores this context entirely.

Vertiv goes on to fault Dr. Pokharna for allegedly failing to "identify a complete list of equations a POSITA would know to use." Op. Br. 29. But Valtrus is unaware of any rule of claim construction (and Vertiv cites none) that so requires. And although Vertiv misrepresents Dr. Pokharna's testimony as a "know it if he saw it approach," *id.*, Dr. Pokharna actually testified that a POSITA would know that the number of formulae and indices of air re-circulation is limited: "I answered that question that [in addition to RHI] there could be at least two more [types], which could be the inverses of those or the ratio of RHI and SHI. But it's a very limited set that has any physical meaning." Dkt. 133-12 (Pokharna Tr.) 41:7-11; *see also* 42:1-9. Dr. Pokharna further explained that a POSITA would understand that if a formula is "based on the [inlet, outlet, and air supply] temperatures, and …can change because of re-circulation" then that formula calculates "indices of air re-circulation." *Id.* 50:12-51:5. Vertiv offers no rebuttal to these points or *any* evidence that a POSITA would not understand these terms or would not understand how to compare two calculated indices.

Vertiv relies heavily on *Dow Chem. Co. v. Nova Chemicals Corp. (Canada)*, 803 F.3d 620, 635 (Fed. Cir. 2015) and *Teva Pharmaceuticals USA, Inc. v. Sandoz, Inc.*,789 F.3d 1335, 1344–45 (Fed. Cir. 2015), but neither case stands for the blanket proposition that the possibility of using more than one formula to meet a claim limitation renders that claim indefinite. Instead, *Dow* and *Teva* explain that when a specific *value* is claimed (e.g., "coefficient greater than or equal to 1.3"

in *Dow* and "weight of about 5 to 9 kilodaltons" in *Teva*) *and* there are multiple equations that could be used to calculate that value, *and* (crucially) varying the equation used will change whether or not the claim is infringed, then the claim is indefinite. *Dow Chem. Co.* 803 F.3d 620 at 635; *Teva Pharmaceuticals USA, Inc.*,789 F.3d 1335, at 1344–45.

Here, however, which value is calculated or which formula is used does not affect infringement because claim 1 does not claim the resultant index value. Instead, claim 1 is targeted at the evaluation of components based on a comparison of indices of air re-circulation calculated before and after a change in the flow field settings. Pokharna Decl. ¶¶ 79-80. Courts routinely find claims like this to be definite. For instance, in *Finalrod*, this Court found claims definite that did not require the measurement of a "specific value of compressive force" but only a comparison of values even if there were "alternative ways to compare the compressive forces." *Finalrod IP, LLC v. Endurance Lift Sols., Inc.*, 2021 WL 2187980, at *12 (E.D. Tex. May 28, 2021) (distinguishing *Teva*); *see also Nabors Drilling Techs. USA, Inc. v. Helmerich & Payne Int'l Drilling Co.*, No. 2022 WL 3448648, at *13 (N.D. Tex. Aug. 17, 2022) ("Put differently, unlike in *Teva*, Nabors has not shown that calculating cost one way will render an embodiment within the scope of the claims, whereas calculating it a different way makes it outside the claims. The Court does not read *Teva* as creating a rigid rule that a claim requiring a calculation must always specify only one method of performing that calculation lest the claim be indefinite.").

Accordingly, Vertiv's argument should be rejected. Because the other at-issue independent claims—Claims 13, 22, 32, and 37—all similarly recite "indices of air recirculation" and are based on a comparison of before and after air re-circulation index values, Vertiv's arguments fail for the same reasons. '870 patent 22:10-23; 23:40-49; 32:9-15; 26:5-10.

## III.    CONCLUSION

Valtrus respectfully requests that the Court adopt its proposed constructions.

Dated: September 19, 2025

Respectfully submitted,

*/s/ Eric H. Findlay*

Matthew G. Berkowitz
Aaron Morris
Tim Trost
REICHMAN JORGENSEN
 LEHMAN & FELDBERG LLP
100 Marine Parkway, Suite 300
Redwood Shores, CA 94065
Fax: (650) 560-3501
Tel.: (650) 623-1401
mberkowitz@reichmanjorgensen.com

Connor S. Houghton
Ariane S. Mann
REICHMAN JORGENSEN
 LEHMAN & FELDBERG LLP
1909 K Street, NW, Suite 800
Washington, DC 20006
Fax: (650) 560-3501
Tel.: (202) 894-7310
chouhgton@reichmanjorgensen.com

Patrick Colsher
REICHMAN JORGENSEN
 LEHMAN & FELDBERG LLP
400 Madison Avenue, Suite 14D
New York, NY 10017
Fax: (650) 560-3501
Tel.: (212) 381-1965
pcolsher@reichmanjorgensen.com

Eric H. Findlay (TX Bar No. 00789886)
FINDLAY CRAFT, P.C.
7270 Crosswater Avenue, Suite B
Tyler, Texas 75703
Tel: (903) 534-1100
Fax: (903) 534-1137
Email: efindlay@findlaycraft.com

*Attorneys for Defendant Valtrus Innovations
  Ltd.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 19, 2025, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing *via* electronic mail to all counsel of record.

/s/ *Eric H. Findlay*
 Eric H. Findlay
