**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| VALTRUS INNOVATIONS LIMITED, *et al.*,<br>*Plaintiffs*,<br>v.<br>NTT DATA SERVICES, LLC, *et al.*,<br>*Defendants*. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | CASE NO. 2:24-CV-00361-JRG-RSP<br>(Lead Case) |

**CLAIM CONSTRUCTION ORDER**

In these consolidated patent cases, Valtrus Innovations Ltd. alleges infringement by NTT Data Services, LLC, and various affiliates of seven patents related to cooling computer systems. Compl., Dkt. No. 1; *see also, e.g.*, U.S. Patent 6,718,277 at [57] (describing the invention generally as "[a] method and system for controlling atmospheric conditions within a building"); U.S. Patent 6,854,287 at [57] ("A system and method for cooling a room configured to house a plurality of computer systems."); U.S. Patent 6,862,179 at 2:17–18 ("[T]he invention pertains to a method of cooling a plurality of racks in a data center."); U.S. Patent 7,031,870 at 2:40–47 (summarizing the invention as "a method for evaluating one or more components in a data center" that includes calculating "[i]ndices of air re-circulation for the one or more heat dissipating devices . . . based upon the detected inlet temperatures, outlet temperatures and supplied air temperatures"). Vertiv Corporation has intervened and sued separately in the member case for a declaratory judgment that the asserted claims are not infringed. Compl., Dkt. No. 1, No. 2:24-CV-00907-JRG-RSP.

In their claim-construction briefing, the parties present ten disputes from four of the asserted patents. Recently, however, the parties advised the Court they have resolved the disputes concerning two of the patents. Joint Notice Regarding Resolution of Claims, Dkt. No. 162. With

that resolution, the parties leave open disputes about two terms from the ’287 Patent and three from the ’179 Patent. Having considered the parties’ briefing on those remaining terms, along with arguments at an October 14, 2025 hearing, the Court resolves the disputes as follows.

## I. BACKGROUND

### A. U.S. Patent 6,854,287

The ’287 Patent “pertains to a method for cooling a room configured to house a plurality of computer systems.” ’287 Patent at 2:34–35. The patent explains that, at the time of invention, conventional data centers used air conditioning units in continuous operation, which were “generally designed to operate according to a worst case scenario.” *Id.* at 2:15–17. In that case, the units are cooling components that might already be within an acceptable temperature range, which is inefficient. *Id.* at 2:26–29.

The patent teaches a more efficient method. As shown in Figures 1–2 (below), a room (10) houses several computer racks (12) and a cooling system (20). The cooling system has a plurality of heat exchanger units (HEUs) (22) and a cooling device (24). The HEUs are supported from a ceiling (16) and receive and deliver cooling fluid in fluid lines (28) that run to and from the cooling device (24).




FIG. 1




*FIG. 2*

As shown in Figure 2, which is an enlarged view of Window A of Figure 1, sensors (46, 48) are located on the racks (12) and in the fluid lines (28). As shown in Figure 5 (below), to cool the racks when necessary, a cooling device controller monitors temperature readings from the sensors and, based on those readings, alters one or both of (a) the airflow through the HEUs, and (b) the temperature of the cooling fluid within the fluid lines. '287 Patent at 11:21–33.




FIG. 5

Claim 1 includes both terms at issue from this patent:

1. A method for cooling **a room configured to house a plurality of computer systems**, said method comprising:

providing a plurality of heat exchanger units configured to receive air from said room and to deliver air to said room;

supplying said plurality of heat exchanger units with cooling fluid from an **air conditioning unit**;

cooling said received air through heat exchange with the cooling fluid in the plurality of heat exchanger units;

sensing temperatures at one or more locations in said room;

> controlling at least one of the temperature of said cooling fluid and said air delivery by said plurality of heat exchanger units to said room in response to said sensed temperatures at said one or more locations; and
>
> wherein the step of controlling said air delivery by said plurality of heat exchanger units comprises individually manipulating a mass flow rate of the cooling fluid supplied to each of the plurality of heat exchanger units.

’287 Patent at 14:17–37 (disputed terms in bold). Specifically, the parties dispute whether the preamble is limiting and whether there must be a many-to-one relationship between the HEUs and the recited “air conditioning unit.”

**B. U.S. Patent 6,862,179**

The ’179 Patent pertains “to a method of cooling a plurality of stacks in a data center.” ’179 Patent at 2:16–17. Like the ’287 Patent,[1] the ’179 Patent explains that, at the time of invention, conventional data centers used air conditioning “generally designed to operate according to a worst case scenario.” *Id.* at 1:64–66; *id.* at 2:1–4 (“[C]onventional cooling systems often attempt to cool components that may not be operating at a level which may cause its temperature to exceed a predetermined temperature range.”).

To address the inefficiency of operating this way, the ’179 Patent teaches cooling data center racks “by activating a cooling device and opening a controllable partition configured to vary a supply of cooling fluid within a zone of the data center” that includes a rack. ’179 Patent at [57]. As shown in Figure 1 (below), a data center (10) contains cooling systems (12a–12d) that maintain racks (14a–14p) within a predetermined temperature range.

[1] Although the patents are not related, they have the same Background, share an inventor, and were both originally assigned to Hewlett-Packard Development Company, L.P.




**FIG. 1 of the '179 Patent**

To control the amount of cooling fluid delivered to the racks' components and subsystems, partitions (22a–22j) subdivide the data center (18) into zones (20a–20h). Controllable partitions (26a–26f), which are attached to motors (28a–28f), are configured open and close to control cooling fluid movement between the zones. Opening and closing the controllable partitions allows or restricts airflow to regulate temperature within the zone.

The parties have three disputes relating to this patent. Two of those disputes concern terms in Claim 1:

> 1. A method of cooling a plurality of racks in a data center, said method comprising:
>
> activating a cooling device and opening a **controllable partition** configured to vary a supply of **cooling fluid** within a zone of said data center, said zone including at least one associated rack of said plurality of racks;
>
> sensing the temperature of said at least one associated rack;
>
> determining whether said sensed temperature is within a predetermined temperature range; and

> manipulating said **controllable partition** to vary said supply of said **cooling fluid** to said zone in response to said sensed temperature being outside said predetermined temperature range.

'179 Patent at 14:17–36 (disputed terms in bold). The third dispute concerns a phrase from Claim 9:

> 9. The method according to claim 4, further comprising:
>
> receiving temperatures from a **movable device configured to detect at least one environmental condition at various locations of said data center**;
>
> determining whether at least one of said sensed temperatures and received temperatures are within a predetermined temperature range; and
>
> manipulating said controllable partition to vary said supply of said cooling fluid to said zone in response to at least one of said sensed and received temperatures being outside of said predetermined temperature range.

*Id.* at 15:7–11 (disputed term in bold).

## II. LEGAL STANDARDS

"[T]he claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (*en banc*). As such, if the parties dispute the scope of the claims, the court must determine their meaning. *See, e.g.*, *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1317 (Fed. Cir. 2007) (Gajarsa, J., concurring in part); *see also Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 390 (1996), *aff'g*, 52 F.3d 967, 976 (Fed. Cir. 1995) (*en banc*).

Claim construction, however, "is not an obligatory exercise in redundancy." *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997). Rather, "[c]laim construction is a matter of [resolving] disputed meanings and technical scope, to clarify and when necessary to

explain what the patentee covered by the claims . . . ." *Id.* A court need not "repeat or restate every claim term in order to comply with the ruling that claim construction is for the court." *Id.*

When construing claims, "[t]here is a heavy presumption that claim terms are to be given their ordinary and customary meaning." *Aventis Pharm. Inc. v. Amino Chems. Ltd.*, 715 F.3d 1363, 1373 (Fed. Cir. 2013) (citing *Phillips*, 415 F.3d at 1312–13). Courts must therefore "look to the words of the claims themselves . . . to define the scope of the patented invention." *Id.* (citations omitted). The "ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, *i.e.,* as of the effective filing date of the patent application." *Phillips*, 415 F.3d at 1313. This "person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.*

Intrinsic evidence is the primary resource for claim construction. *See Power-One, Inc. v. Artesyn Techs., Inc.*, 599 F.3d 1343, 1348 (Fed. Cir. 2010) (citing *Phillips*, 415 F.3d at 1312). For certain claim terms, "the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Phillips,* 415 F.3d at 1314; *see also Medrad, Inc. v. MRI Devices Corp.*, 401 F.3d 1313, 1319 (Fed. Cir. 2005) ("We cannot look at the ordinary meaning of the term . . . in a vacuum. Rather, we must look at the ordinary meaning in the context of the written description and the prosecution history."). But for claim terms with less-apparent meanings, courts consider "those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean . . . [including] the words of the claims themselves, the remainder of the specification, the

prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." *Phillips*, 415 F.3d at 1314.

## III. THE LEVEL OF ORDINARY SKILL IN THE ART

The level of ordinary skill in the art is the skill level of a hypothetical person who is presumed to have known the relevant art at the time of the invention. *In re GPAC*, 57 F.3d 1573, 1579 (Fed. Cir. 1995). In resolving the appropriate level of ordinary skill, courts consider the types of and solutions to problems encountered in the art, the speed of innovation, the sophistication of the technology, and the education of workers active in the field. *Id.* Importantly, "[a] person of ordinary skill is also a person of ordinary creativity, not an automaton." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 421 (2007).

Here, Vertiv asserts a skilled artisan, at the time of invention, "would have at least a bachelor's degree in mechanical or chemical engineering or an equivalent discipline, together with four years of experience in the design and/or operations of atmospheric management systems for buildings or electronics or computer systems." Dkt. No. 133 at 1 (citing Abraham Decl., Dkt. No. 133-1 ¶¶ 27–36). Alternatively, Vertiv asserts a skilled artisan would have had "a master's degree in mechanical or chemical engineering or an equivalent discipline, with two years of experience." *Id.* Valtrus does not challenge this level of skill in its briefing, but its expert asserts a skilled artisan "would have had a bachelor's degree in mechanical engineering, electrical engineering, process engineering, or equivalent training, and approximately four years of work experience in thermal management or cooling systems with a basic knowledge regarding the operation of data centers." Pokharna Decl., Dkt. No. 148-4 ¶ 27. Given the similarity of the parties' characterizations, and considering that neither party contends the proper constructions of the disputed terms turn on

which characterization the Court adopts, the Court will resolve the differences between these levels of skill only to the extent necessary to resolve the disputes *infra*.

## IV. THE DISPUTED TERMS

### A. "A method for cooling a room configured to house a plurality of computer systems" ('287 Patent, Claim 1)

| Vertiv's Construction | Valtrus's Construction |
|---|---|
| The preamble is not limiting | The preamble is limiting |

Claim 1 recites:

> 1. A method for cooling **a room configured to house a plurality of computer systems**, said method comprising:
>
> providing a plurality of heat exchanger units configured to receive air from **said room** and to deliver air to **said room**;
>
> supplying said plurality of heat exchanger units with cooling fluid from an air conditioning unit;
>
> cooling said received air through heat exchange with the cooling fluid in the plurality of heat exchanger units;
>
> sensing temperatures at one or more locations in **said room**;
>
> controlling at least one of the temperature of said cooling fluid and said air delivery by said plurality of heat exchanger units to **said room** in response to said sensed temperatures at said one or more locations; and
>
> wherein the step of controlling said air delivery by said plurality of heat exchanger units comprises individually manipulating a mass flow rate of the cooling fluid supplied to each of the plurality of heat exchanger units.

'287 Patent at 14:17–37 (emphasis added).

Generally, the parties dispute whether these claims are limited "via the preamble to data centers, data center racks, and related equipment." Dkt. No. 133 at 12. Vertiv stresses the claims don't "mention data centers or data center racks or any steps involving data center racks or other

data center equipment." *Id.* at 13. Valtrus responds the preamble is limiting because it provides antecedent basis for "said room" throughout the claim. Dkt. No. 148 at 11. It notes the specification's references to data center cooling, and that the shape and size of the room affect the optimization strategy for that cooling. *Id.* at 12.

The dispute centers on the effect of the phrase "configured to house a plurality of computer systems." Clearly, "said room" in the body refers to "a room" in the preamble, which has certain characteristics, and the Court sees no reason "said room" in the body would not also incorporate the additional characteristics of that room. In other words, "said room" does not refer to just any room, but the room of the preamble, which is "configured to house a plurality of computer systems."

Vertiv relies on *TomTom, Inc. v. Adolph*, 790 F.3d 1315 (Fed. Cir. 2015), but that case is distinguishable. In *TomTom*, the preamble of the only asserted independent claim recited "[a] method for generating and updating data for use in a destination tracking system of at least one mobile unit." *TomTom*, 790 F.3d at 1318. "The district court held that because the phrase 'at least one mobile unit' provides an antecedent basis for the later use of the terms 'said mobile unit' and 'the mobile unit' in the body of the claim, the *entire* preamble must be construed." *Id.* at 1323. The district court then construed "generating and updating data for use in" as "the data generated and updated by the mobile unit *is used by that unit*," *id.*, thus tying the "generating and updating data" part of the preamble to the "at least one mobile unit."

The appellate court's reasoning in *TomTom* supports Valtrus's position—not Vertiv's. The appellate court agreed with the district court that the preamble was limiting as to "'destination tracking system of at least one mobile unit' . . . because the claims do not concern just any 'mobile unit,'" but rather the "at least one mobile unit" of the preamble. *TomTom*, 790 F.3d at 1323. The

court simply reasoned that phrase does not necessarily convert the entire preamble into a limitation. *Id.* Similarly, the claims here do not concern just any "room," but the room of the preamble, which is a room "configured to house a plurality of computer systems." As such, the preamble is limiting.

### B. "[an/said/the] air conditioning unit" ('287 Patent, Claims 1, 2, 7, 8, 10, 14, 21)

| Vertiv's Construction | Valtrus's Construction |
|---|---|
| "a single air conditioning unit" | Plain and ordinary meaning |

Vertiv seeks to exclude systems and methods without many heat exchanger units (HEUs) connected to just one air conditioning unit. Vertiv says the last limitation's requirement of "individually manipulating mass flow rate of the cooling fluid supplied to each of the plurality of heat exchangers" supports this result. Dkt. No. 133 at 15. Similarly, says Vertiv, the specification only discloses multiple HEUs with cooling from a single air conditioner. *Id.* at 16–17. Finally, during prosecution, the applicant amended "a heat exchanger unit" to "a plurality of heat exchanger units," but did not similarly modify "an air conditioner unit." This, says Vertiv, shows the applicants' intent to claim a system with only one air conditioning unit. *Id.* at 17–18.

"'[A]n indefinite article 'a' or 'an' in patent parlance carries the meaning of 'one or more' in open-ended claims containing the transitional phrase 'comprising.'" *Baldwin Graphic Sys., Inc. v. Siebert, Inc.*, 512 F.3d 1338, 1342 (Fed. Cir. 2008) (quoting *KCJ Corp. v. Kinetic Concepts, Inc.*, 223 F.3d 1351, 1356 (Fed. Cir. 2000)). "That 'a' or 'an' can mean 'one or more' is best described as a rule, rather than merely as a presumption or even a convention." *Id.* "The exceptions to this rule are extremely limited: a patentee must 'evince a clear intent' to limit 'a' or 'an' to 'one.'" *Id.* (quoting *KCJ Corp.*, 223 F.3d at 1356). But "[w]hen the claim language and specification indicate that 'a' means one and only one, it is appropriate to construe it as such even in the context of an open-ended 'comprising' claim." *Harari v. Lee*, 656 F.3d 1331, 1341 (Fed. Cir. 2011).

Here, neither the claim language nor the specification suggests there must be a many-to-one relationship between HEUs and air conditioners. For example, applying the general rule, Claim 1 would recite "supplying said plurality of heat exchanger units with cooling fluid from [an] one or more air conditioning units." There's nothing about that interpretation that is inconsistent with the specification or the structure of the claim itself. Moreover, that the specification only discloses multiple heat exchangers with cooling from a single air conditioner is at most one embodiment.

Vertiv relies heavily on *Harari*, in which the Federal Circuit reversed a construction by the Board of Patent Appeals and Interferences that "a bit line" meant "one or more bit lines." *Harari*, however, concerns a significantly different record and technology. *See Emerson Elec. Co. v. SIPCO, LLC*, 826 F. App'x 904, 914 (Fed. Cir. 2020) ("[C]laim construction issues presented in patent cases are highly fact and case-specific because they rely on the intrinsic evidence: the claim language, the written description, and the prosecution history."). Regardless, the appellate court reasoned "the plain language of the claim clearly indicates that only a single bit line is used when accessing a number of [memory] cells." *Harari*, 656 F.3d at 1342 (providing three reasons from the claim itself as to why "a bit line" does not mean "one or more bit lines").

Here, however, "an air conditioning unit" does not play so central a role in the claims. Claim 1, for example, only recites the limitation once. The Abstract, which is a general description of the invention, does not refer to an air conditioning unit. *See* '287 Patent at [57]. And unlike the importance of "a bit line" in *Harari*'s claim, whether the supplied air comes from one or more than one air conditioning unit is not important to the objective of "cooling a room." Rather, both the Abstract and the claims make clear the *heat exchanger units* are the heart of the invention.

Regarding the prosecution history, Vertiv's argument amounts to a disclaimer or disavowal argument based on the intent of the applicant. But Vertiv infers that intent based on amendments to a *different* term combined with the lack of amendments to *this* term. That is not enough to overcome the general rule that "a" or "an" means "one or more," or to show disclaimer.

The Court thus construes this term as "one or more air conditioning units."

**C. "cooling fluid" ('179 Patent, Claims 1–4, 6–9, 13–22, 25–28, 32–37, 40)**

| Vertiv's Construction | Valtrus's Construction |
|---|---|
| "fluid that cools data center racks" | Plain and ordinary meaning |

Claim 1 recites:

> 1. A method of cooling a plurality of racks in a data center, said method comprising:
>
> activating a cooling device and opening a controllable partition configured to vary a supply of **cooling fluid** within a zone of said data center, said zone including at least one associated rack of said plurality of racks;
>
> sensing the temperature of said at least one associated rack;
>
> determining whether said sensed temperature is within a predetermined temperature range; and
>
> manipulating said controllable partition to vary said supply of said **cooling fluid** to said zone in response to said sensed temperature being outside said predetermined temperature range.

'179 Patent at 18:37–51 (emphasis added).

Vertiv characterizes the dispute as whether "cooling fluid" must be the "fluid that cools data center racks," as it urges, or whether it can be "the refrigerant that cools the fluid that cools data center racks," as Valtrus alleges. Dkt. No. 133 at 19. According to Vertiv, the claim language supports its position, in part because the claims require supplying the cooling fluid to the racks.

*Id.* (citing '179 Patent at 22:51–52). So does the specification, says Vertiv, which identifies cooling fluid moving around racks. *Id.* at 19–20 (citing '179 Patent at 5:19–23). Valtrus responds that nothing in the claims limits the cooling fluid to only be used in the racks. Dkt. No. 148 at 16–17.

The Court agrees with Valtrus. "Cooling fluid" has an ordinary meaning, which Vertiv does not challenge. The result Vertiv seeks might necessarily result from other language in the claims, like the meaning of "partition" or "zone," but that's a different issue.[2] Accordingly, the Court will give this term a "plain and ordinary meaning" construction.

**D. "controllable partition" ('179 Patent, Claims 1, 9, 16, 22, 27, 29–31, 37–39)**

| Vertiv's Construction | Valtrus's Construction |
|---|---|
| "a barrier that subdivides a space into zones and is manipulable to vary a supply of cooling fluid to a zone" | "a 'controllable partition' cannot be a 'vent'" |

The parties dispute whether a partition is *any* device that controls fluid flow, like the motorized ball valves asserted in Valtrus's infringement contentions, or whether it's something narrower. Vertiv stresses the specification provides only two examples of partitions—barriers and walls. Dkt. No. 133 at 22 (citing '179 Patent at 4:15–16). In response, Valtrus says "the patent makes clear it refers to a variety of structures that . . . can be controlled for different purposes." Dkt. No. 148 at 18.

The Court agrees with Vertiv. The only definition the Court finds in the record for "partition" is "something that divides; [especially]: an interior dividing wall." Abraham Decl., Dkt. No.

[2] Notably, the two patents use "cooling fluid" in different ways. In the embodiments of the '287 Patent, refrigerant chills the "cooling fluid," which is then passed to and from the heat exchangers in the fluid lines. The cooling fluid then cools the air in the room, which in turn cools the racks. *See* '287 Patent at 3:34–48. But in the embodiments of the '179 Patent, there is no "intermediate" cooling fluid. Instead, the "cooling fluid" is the air supplied to the room. '179 Patent at 4:50–5:2.

133-1 ¶ 144 (quoting *partition*, 1979 Merriam-Webster's New Collegiate Dictionary at 829). That definition is consistent with the specification's examples of walls and barriers that divide the cooling center into zones.

Valtrus's arguments are unpersuasive for two reasons. First, nowhere does Valtrus explain what a "partition" is, but only that it is *not* an "automatically adjustable vent." Dkt. No. 148 at 21 (quoting the applicants' argument during prosecution that a cited reference, Bash,[3] "pertains to actuation of an automatically adjustable vent in response to detected pressure in a plenum"). Nowhere, however, does Valtrus explain its reasoning for why an "automatically adjustable vent" is not a "partition," but a ball valve is, despite that both control fluid flow. Nor does Valtrus offer evidence that a skilled artisan would understand a "valve" to be a "partition" or that valves perform "dividing" or "parting" functions.

Second, despite Valtrus's assertion that "the patent makes clear it refers to a variety of structures that . . . can be controlled for different purposes," Valtrus doesn't identify that "variety of structures." It suggests the structures would be anything with louvered, rotatable, and retractable features. Dkt. No. 148 at 19 ("Like the specification, the claim language indicates that a variety of structures, e.g., louvered, rotatable, and retractable structures may be controllable partitions, which Vertiv's proposed construction does not account for."). The patent, however, uses those terms to further limit "partition," not to define what a "partition" is. *See, e.g.*, '179 Patent at 4:24–26 ("In various embodiments of the invention, the [controllable partitions] may include louvered, rotating and/or retractable partitions."), 23:1–5 (reciting, in Claims 29–31, that the controllable partitions

---

[3] The common inventor to the '179 Patent and '287 Patent is also a named inventor in Bash, which was also once assigned to Hewlett-Packard Development Company, L.P. *See* note 2, *supra*.

have "a plurality of louvers operable to adjust from fully open to fully closed," is "operable to rotate," and is "operable to retract and elongate," respectively). Thus, the Court must still address the meaning of "partition" in the context of this patent.

Nothing in the patent suggests a partition is anything other than something that subdivides a room or space, which of course cannot be filled with a liquid to cool the racks' components. The Court therefore construes "controllable partition" as "a barrier that subdivides an air space into zones and is manipulable to and between open and closed positions."

**E. "movable device configured to detect at least one environmental condition at various locations of said data center" ('179 Patent, Claims 9, 22)**

| Plaintiff's Construction | Defendants' Construction |
|---|---|
| "a device operable to travel to various locations within a data center to detect at least one environmental condition at the various locations" | Plain and ordinary meaning |

Claim 9 recites the step of "receiving temperatures from a *movable device* configured to detect at least one environmental condition at various locations of said data center." '179 Patent at 15:8–11 (emphasis added). Similarly, Claim 22 recites "means for" performing that step. *Id.* at 18:13–16. The parties dispute the scope of "movable device" and, specifically, whether "movable" means the device must be "operable to travel."

According to Vertiv, "Valtrus's infringement contentions allege that stationary sensors that are capable of being moved to a different location thereafter to operate as a stationary sensor" meet this limitation. Dkt. No. 133 at 24. Vertiv cites the specification's reference to mobile devices, and to a device disclosed in U.S. Patent 7,114,555, which the '179 Patent incorporates by reference. *Id.* at 24–25. Valtrus responds that a movable device is simply one that is "not stationary," and does not require some semi-autonomous device. Dkt. No. 148 at 23–24.

The Court agrees with Valtrus. Ordinarily, a "movable device" is simply a device that is, as Valtrus puts it, "not stationary." Although Vertiv does not allege a specific basis for deviating from that meaning, its construction seems rooted in some sort of theory of implicit lexicography or disclaimer, which, as with express lexicography and disclaimer, must be clear and unmistakable. *See Thorner v. Sony Comput. Entm't Am. LLC*, 669 F.3d 1362, 1368 (Fed. Cir. 2012) (noting any "'implied' redefinition must be so clear that it equates to an explicit one," so a skilled artisan "would have to read the specification and conclude that the applicant has clearly . . . acted as its own lexicographer"). But nowhere other than the claims does the patent refer to a "movable device." The '555 Patent refers to a "movable device" only once, and not in a way that suggests that term has something other than its well-understood meaning. '555 Patent, Dkt. No. 133-10 at 3:18. While the device shown in Figure 1A of the '555 Patent might be one type of movable device, nothing in the patent limits the term to a device with a self-propelling mechanism. Accordingly, the Court rejects Vertiv's construction and construes "movable device" as "device that is not fixed or stationary."

## V. CONCLUSION

| Disputed Term | The Court's Construction |
|---|---|
| "A method for cooling a room configured to house a plurality of computer systems" ('287 Patent, Claim 1) | The preamble is limiting |
| "[an/said/the] air conditioning unit" ('284 Patent, Claims 1, 2, 7, 8, 10, 14, 18, 20, 21) | "one or more air conditioning units" |
| "cooling fluid" ('179 Patent, Claims 1–4, 6–9, 13–22, 25–28, 32–37, 40) | Plain and ordinary meaning |

| | |
|---|---|
| "controllable partition"<br>('179 Patent, Claims 1, 9, 16, 22, 27, 29–31, 37–39) | "a barrier that subdivides an air space into zones and is manipulable to and between open and closed positions" |
| "movable device configured to detect at least one environmental condition at various locations of said data center"<br>('179 Patent, Claims 1, 9, 22) | "device that is not fixed or stationary" |

The Court **ORDERS** each party not to refer, directly or indirectly, to its own or any other party's claim-construction positions in the presence of the jury. Likewise, the Court **ORDERS** the parties to refrain from mentioning any part of this opinion, other than the actual positions adopted by the Court, in the presence of the jury. Neither party may take a position before the jury that contradicts the Court's reasoning in this opinion. Any reference to claim construction proceedings is limited to informing the jury of the positions adopted by the Court.

**SIGNED this 26th day of October, 2025.**

ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE