IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

MARSHALL DIVISION

| | | |
|---|---|---|
| VALTRUS INNOVATIONS LTD., | )( | |
| PLAINTIFF, | )( | CIVIL ACTION NO. |
| | )( | 2:24-CV-361-JRG-RSP |
| VS. | )( | MARSHALL, TEXAS |
| | )( | |
| NTT DATA SERVICES, LLC, | )( | |
| ET AL., | )( | MAY 18, 2026 |
| DEFENDANTS. | )( | 9:00 A.M. |

REDACTED PRETRIAL HEARING

BEFORE THE HONORABLE ROY S. PAYNE

UNITED STATES MAGISTRATE JUDGE

VERTIV CORPORATION:

Mr. Daniel J. Schwartz
Mr. Timothy P. Maloney
Ms. Allison Strong
Nixon Peabody LLP
70 W. Madison
Suite 5200
Chicago, IL 60602

Mr. Michael W. Gray
Nixon Peabody LLP
300 South Grand Avenue
Suite 4100
Los Angeles, CA 90071

Mr. William E. (Bo) Davis, III
Mr. Ty Wilson
Davis Firm, PC
213 N. Fredonia Street
Suite 230
Longview, TX 75601

VALTRUS INNOVATIONS: Mr. Matt Berkowitz
Reichman Jorgensen Lehman & Feldberg LLP
100 Marine Parkway
Suite 300
Redwood Shores, CA 94065

Mr. Connor Houghton
Reichman Jorgensen Lehman & Feldberg LLP
1909 K Street, NW
Suite 800
Washington, DC 20006

Mr. Sean M Mccarthy
Reichman Jorgensen Lehman & Feldberg LLP
650 Fifth Avenue
Suite 2320
New York, NY 10019

Mr. Eric H. Findlay
Findlay Craft, PC
7270 Crosswater Avenue
Suite B
Tyler, TX 75703

COURT REPORTER: Ms. Shelly Holmes, CSR, TCRR
Official Court Reporter
Honorable Robert W. Schroeder III
United States District Judge
Eastern District of Texas
Texarkana Division
500 North State Line Avenue
Texarkana, TX 75501
shelly_holmes@txed.uscourts.gov

(Proceedings recorded by mechanical stenography, transcript produced on a CAT system.)

COURT SECURITY OFFICER: All rise.

THE COURT: Good morning. Please be seated.

We are here for the pretrial conference in, I guess -- whether it's Vertiv versus Valtrus or Valtrus versus Vertiv, it is between those two entities and is under our Lead Case No. 2:24-361.

Would counsel state their appearances for the record?

MR. DAVIS: Good morning, Your Honor. Bo Davis on behalf of the Plaintiff, Vertiv. With me today is Mr. Tim Maloney, Dan Schwartz, Michael Gray from Nixon Peabody, and Allison Strong from Nixon Peabody, Ty Wilson. And then from Vertiv, Mr. Eric Broxterman. We're ready to proceed, Your Honor.

THE COURT: All right. Thank you, Mr. Davis.

MR. FINDLAY: Good morning, Your Honor. Eric Findlay for the aspiring Plaintiff, Valtrus. Also with me, Matt Berkowitz, Connor Houghton, and Sean McCarthy. We're ready to proceed, Your Honor.

THE COURT: All right. As counsel know, this case was set for trial before Judge Gilstrap in June. He has issued the order of trials for June 22, and this case is not on the -- on that listing of the five cases currently. I expect that this case is going to be reset in the not distant future for either the next -- the July docket is

July the 13th, and there's an August docket on August the 17th.

When we get a trial date, I do intend to set a follow-up pretrial conference date associated with that, and I'm going to reserve some of the trial protocol issues until that time.

What I would really like to accomplish today is to address the structural issues about this because it is a fairly unusual procedural pattern and also take up the motions in limine and perhaps we can even make some progress on the exhibits.

But I'd like to start off by hearing from counsel for Vertiv about -- well, I have some questions about the declaratory judgment and how we can proceed. So whoever wants to address those.

MR. SCHWARTZ: Your Honor, Dan Schwartz on behalf of Vertiv.

THE COURT: Mr. Schwartz, the -- you know, it struck me when I was reading the pretrial order that right off the bat the parties disagree about what the nature of the judgment is that Vertiv is seeking, and I would like to start off by focusing on that in terms of -- you know, the pretrial order has Vertiv's position as seeking a declaration of invalidity and that Vertiv's products don't infringe.

The verdict form that was issued or offered by Vertiv has a request or a question about whether Valtrus can prove that the claim -- the claims -- the listed claims are infringed when used by accused products.

Tell me what it is that you're specifically asking the jury to declare.

MR. SCHWARTZ: Well, with respect to invalidity, we think it's pretty straightforward. The issue on infringement is -- as the issues have evolved, the non-infringement ruling we seek is one of the accused products, which there is no dispute as to what those accused products are.

THE COURT: And are those defined somewhere in the record? I noticed your verdict form just refers to Accused Products with capital letters. Is it defined?

MR. SCHWARTZ: It is, Your Honor. I believe we have it defined perhaps in the jury instructions. If it's not in the verdict form -- I believe we also had it in the verdict form, as well. I don't believe there's any dispute between the parties as to what those accused products are.

THE COURT: All right. And so go ahead. You're referring to the -- a declaration about the accused products, and what about them?

MR. SCHWARTZ: That they do not infringe any -- claims -- any of the claims of the '287, and they --

THE COURT: Well, no one contends that they do, right?

MR. SCHWARTZ: That is correct, Your Honor.

THE COURT: So what kind of a declaration is that?

MR. SCHWARTZ: Well, it is -- as Your Honor may be aware, obviously this case started with disputes against our customers and just recently a new wave of suits against an additional set of customers, all based on their use of these products.

THE COURT: Why wouldn't the appropriate question then be more like what Valtrus frames it as, is whether the accused products can be used to infringe the method claims?

MR. SCHWARTZ: Well, so we think that that would be very confusing for the jury -- potentially confusing for the jury because it is asking them to resolve a question regarding a bunch of parties who aren't here, and at least there were no pending customer suits even for several months. And so the prospect of putting on a case where they talk about our customers without the customers in the room we believe to be unnecessarily confusing.

The infringement issues rise and fall with the actual structures and -- and structural limitations. There isn't a question of -- we are not debating whether or not how it is used in the particular ways that they have alleged would be different with respect to

infringement/non-infringement. There is no way that they can establish infringement, period, based on the use of those products.

THE COURT: Well, then why isn't that the question that should be put to the jury? Can the accused products be used to infringe?

MR. SCHWARTZ: Your Honor, I don't think we would have any issue with that having talked it through here. We were concerned about potential jury confusion with reference to non-appearing customers. So we would be okay with that, Your Honor.

THE COURT: We'll certainly talk about the extent to which other litigations, and for that matter specific customers, can come up in this trial.

So have you identified in your expert reports or elsewhere the reasons why you contend that your products can't be used to infringe these claims.

MR. SCHWARTZ: Yes, Your Honor. That is fully set forth without the need for any customer to be here for that evidence or testimony.

THE COURT: And give me the flavor of what your non-infringement case is about. If we just use Claim 1, the, you know, independent method claim -- and I could -- I am understanding that it's in the expert reports, but I'm hoping you can boil it down for me a little bit. I want to

make sure that this case that we're setting has a justiciable controversy in it that is properly framed up for a jury.

MR. SCHWARTZ: Yes, Your Honor. And part of this is also included in some of our summary judgment motions, as well.

So, for instance, the air conditioning unit limitation, it is our belief that -- well, the -- I'll start with Valtrus's position, that they have limited the air conditioning unit to a particular kind of compressor, a variable capacity compressor. And that construction of that term, as we've raised in our briefing, is incorrect. A proper construction of that term results in a non-infringement finding for us.

The same is true with Element -- I believe it's 1[e]. And, again, this is in some of our briefing, as well. There is a limitation that talks about controlling the temperature of the -- at least one of the temperature of the cooling fluid or the air delivery. And it is our belief that -- depending on how the claim construction issues or the issues that have been briefed on this are resolved by the Court, will give rise to or not give rise to infringement/non-infringement positions.

THE COURT: So you're relying strictly on claim construction, at least as what you see as claim

construction issues for your non-infringement position?

MR. SCHWARTZ: Yes. Well, Your Honor, as the way we've addressed this, we don't believe that what Valtrus has done is actually proper claim construction. They've kind of redrafted the claim, but -- as we've set forth in the briefs.

But, for instance, with respect to the controlling the temperature of the cooling fluid limitation, we don't do that. Val -- Vertiv -- excuse me, Vertiv doesn't do that, for instance, and so that would be a disputed issue for the jury to resolve.

THE COURT: Uh-huh. All right.

MR. SCHWARTZ: And if I may, Your Honor, that does not have any need for a customer to be here because it is based on the Vertiv compressor technology, their -- their overall system and unit, and it is sold and used as it is intended. And there is no other way that the control of the cooling fluid temperature could be addressed by a customer differently -- one customer to another or anything like that. It's all based on the technology that Vertiv supplies.

THE COURT: Mr. Schwartz, is it your understanding that Valtrus, in taking their position that your products can infringe, is differing from you the way in which your products are used by the customers, or is it just about the

meaning of the terms that are in the various limitations that you're discussing?

MR. SCHWARTZ: It's the latter, Your Honor. If I understand, there's no difference based on customers. It's how they have construed it. The Vertiv products work as they work. There's actually few disputes about how it actually works, and it's just a function of whether or not that infringes without any difference among the customers.

THE COURT: And the issues that you're talking about now as to the understanding of the claims, these were not issues that were raised during claim construction?

MR. SCHWARTZ: That's right, Your Honor.

THE COURT: And it's -- is there a particular reason?

MR. SCHWARTZ: I think you might have to ask Mr. Berkowitz that question because we believe these are issues that should have been raised.

THE COURT: Were you aware of the position that Valtrus is taking before we did the claim construction?

MR. SCHWARTZ: No, Your Honor. These are things that came up in connection with the expert reports for the first time, and then in summary judgment motion practice for the first time. These are things that we had asked about. There are even issues within some of the briefing

that we've done where we've pointed out where the original infringement contentions in these matters had a very different understanding. And then as their expert reports and even some of the belated summary judgment positions are different from those. So we were not aware.

THE COURT: I am expecting that one of the things I'm going to hear from Valtrus is that the disputes that you're referring to have to do with the expert's understanding of what these terms mean in the art.

MR. SCHWARTZ: I believe that will be their position, Your Honor, and we believe that what they have done is not remotely claim construction. They could have raised these in claim construction. They should have raised these in claim construction. There are complete redrafting and new limitations not found anywhere in the specification or in the patent that have been just insert in based on their expert's statement that he is the only person who could have understood the context of the '287 patent, and, therefore, it must mean these very specific narrow things, which perhaps unremarkably avoid the prior versions of Vertiv's equipment but capture the newest versions of them.

THE COURT: What do you see as the fact issue regarding infringement that the jury is going to be asked to decide?

MR. SCHWARTZ: So I would say two, Your Honor. One, is there a proper air conditioning unit, as that term is appropriately understood? That term was not -- that term was construed by Your Honor during the Markman proceeding but not with the issue -- with respect to the issue that Valtrus has now put in play.

There is an issue of one to many with respect to an air conditioning unit, and the plurality of heat exchanger units. The issue now is they have said the air conditioning unit must be a stepless variable speed compressor. That issue was not before Your Honor, but that is the position that they have taken in the expert reports and the dispositive motion briefing. So we believe that that would be properly resolved by the jury under a proper construction.

And then similarly the issue of -- as I mentioned before, the control of the cooling fluid temperature.

And if you'll permit me, Your Honor, there's no dispute that as the laws of thermodynamics work in a compressor, the temperature of the refrigerant, which in this particular instance for these claims is the cooling fluid, there's no dispute that changing the operating parameters of the compressor may change the temperature. There's an issue of whether or not it is controlled in this instance, as required by the claim. And that would be the

other -- another issue to be determined by the jury.

THE COURT: All right. Mr. Schwartz, let me just interrupt you at this point and give Valtrus a chance to respond, and then we'll continue. Thank you.

MR. SCHWARTZ: Thank you, Your Honor.

MR. HOUGHTON: Good morning, Your Honor. Connor Houghton for Valtrus.

So starting back at the beginning of this, I think it's pretty clear that products can't infringe a method claim, and so that's why the verdict form dispute comes out the way it does. They want a declaration that products can't perform a method, and there's no dispute they can, as Your Honor pointed out. So we think pretty clearly to the extent this is going to the jury, the question has to be can these products be used by a customer to infringe? That's what this case is about.

THE COURT: And what I'm asking for now is for you to give me your side of what the fact issues are that a jury would be asked to decide on that question.

MR. HOUGHTON: So pointing to the two -- they apparently only have two non-infringement arguments they intend to present. The first is on air conditioning unit. This is a term that was not construed, so it has its plain and ordinary meaning. Our expert points to a structure in Vertiv's products that he says is an air conditioning unit

within the plain and ordinary meaning of that term. Their expert disagrees and says the plain and ordinary meaning of an air conditioning unit is something broader. And so it's a battle of the experts on that question about whether the structure we point to satisfies the limitation.

THE COURT: To your understanding, does either expert rely upon particular provisions of the intrinsic record to support their position about what the air conditioning unit in the accused products, if any, is?

MR. HOUGHTON: Both experts certainly reference the specification as part of the background in their understanding of the context of this limitation overall. I don't think that means this is a claim construction dispute. I think it's perfectly proper for the experts to reference the specification when explaining the background of the technology, what the inventors were in possession of at the time, how this thing is described in the art generally and in the patent specifically.

And then this is a pretty -- I think there's many decisions from the Court about plain meaning being an issue for the jury even when there's some, you know, reference to the technology background explained by the context of the patent.

THE COURT: That certainly can be true, and it does depend a little bit on whether the expert is taking

the position that this is not being used in the same way that anybody in the field would use it because of something in the intrinsic record.

MR. HOUGHTON: We have evidence both from the intrinsic record and extrinsic evidence about how people in the field use this term, and we say there's certainly a dispute. There's a lot of different ways this term is used all over the place in the field. We list this in opposition to their summary judgment motion. There's at least seven different ways people think of an air conditioning unit. And so, you know, we point to all of those, explain what they all are, explain what the differences are and why it matters here. And then we also reference the background of the patent and explain what the term is referenced to there. But we're not relying solely on the intrinsic record or doing pure claim construction for this.

THE COURT: And Mr. Schwartz was indicating that your expert said that the air conditioning unit, as claimed in Claim 1, needed to be a stepless variable speed unit. Do you agree with that argument?

MR. HOUGHTON: No. We certainly point to that as the structure in the Vertiv product that we say satisfies the "air conditioning unit" term. We don't say it has to be that. There are other things that we say an air

conditioning unit cannot be, and that, you know, is informed by the patent certainly. It's also informed by the extrinsic evidence in our expert's report. But we're not limiting it to say this has to be a variable speed compressor, a stepless capacity compressor. That's the thing we say infringes.

THE COURT: And Mr. Schwartz made reference to a motion for summary judgment. Do you agree that that motion presents this issue in a fairly comprehensive way?

MR. HOUGHTON: I think it's fairly well briefed out there why this is a dispute about the plain meaning. That should be a fact issue for the jury. They certainly raised it. This is the basis for their motion for summary judgment. We obviously disagree with it. We have our positions about why there's a fact issue for the jury. But that's where it's raised in the briefing right now.

THE COURT: So as I understand it, that's -- that's one focus of the -- Vertiv's non-infringement position. And the other focus has to do with controlling the temperature. Is that your understanding?

MR. HOUGHTON: Yes, Your Honor.

THE COURT: And are those -- do you agree that those are the two issues that seem to be disputed between the parties as to non-infringement?

MR. HOUGHTON: It seems to me, reading their

expert reports and their motions that those are the only disputes they have on infringement, and so that's their second non-infringement argument is about controlling.

This one is a little bit more complicated in that there is an 02 Micro issue presented in the summary judgment briefing about this limitation, controlling at least one of the temperature of the cooling fluid and the air delivery. And this is a SuperGuide issue that Your Honor has dealt with several times before, and particularly informed by the specification and the prosecution history here, and that's why we think this needs to be resolved on the briefing before this goes to trial.

But our position is that the limitation requires both controlling the temperature of the cooling fluid and the air delivery. And they take, I think, two positions. For invalidity, they want it to be disjunctive so that you only have to control either the cooling fluid temperature or the air delivery. But for non-infringement, they seem to -- I'm not sure. They don't really say why, but they accept our reading, and they say they don't do the controlling part. There's no dispute they do the air delivery part.

On the controlling issue, we think it's pretty clear that they do control the temperature. It doesn't say

you have to measure the temperature against a set point, which is what their expert's position is. It just says you have to control it.

And they said earlier, there's no dispute that the temperature changes when you change the operating parameters, such as if you increase the speed of the compressor, it's going to heat up the cooling fluid. And that's one of the ways the patent describes how you can control the temperature of the cooling fluid. So our position is they do this pretty clearly.

THE COURT: All right. It is my conclusion from the argument I've heard so far that in order to advance the disposition of the case, I'm going to need to address that motion for summary judgment. And I want to make sure I understand which motion you are both talking about. There are apparently five motions for summary judgment by Vertiv and four by Valtrus?

MR. HOUGHTON: Yes, Your Honor. So there's 11 pending motions, unfortunately. This is Vertiv's motion for summary judgment of non-infringement. So this is Docket 263. That presents the air conditioning unit issue.

And then Valtrus's motion for summary judgment of no invalidity for certain prior art, which is Docket 255, that presents the 02 Micro issue on this controlling. They don't actually have a summary judgment motion pending on

the controlling limitation, but I think if you resolved the 02 Micro dispute, it would at latest sort of clarify whether this is a real non-infringement argument or not.

THE COURT: All right. So that's helpful.

Back to the issue that we started with. It would be Valtrus's position that with respect to the non-infringement issue, the appropriate question is whether the Vertiv accused products can be used to infringe the claims of your patent.

MR. HOUGHTON: That's right, Your Honor. I mean, I don't want to rehash old grounds, but obviously we didn't think that was an appropriate thing for the Court to resolve in the abstract without a customer in the case. That was our subject matter jurisdiction issue. We certainly preserve our arguments there. Still think it's going to be pretty confusing in the hypothetical, but as the case played out, we did our best under the circumstances, and that's where we landed on what could possibly be tried here.

THE COURT: And I will say along those lines that I'm not construing anything you're saying here as waiving the arguments that you've made before that the Court has already addressed. So I want that to be clear.

But you have also in your papers identified your understanding of the claims at issue as Claims 1 through 7.

MR. HOUGHTON: Yes, Your Honor.

THE COURT: Vertiv is referring to Claims 1 through 9 at different places. I understand that those are all method claims. Do you -- is there some reason why you do not refer to 8 and 9 as part of the dispute?

MR. HOUGHTON: Yes, Your Honor. We dropped those to streamline the case. We didn't think they were necessary or important, dependent claims that didn't add anything, so we were trying to streamline the issues for trial.

This is at issue in one of Vertiv's summary judgment motions, as well, Docket 260. They moved for summary judgment of non-infringement of both Claims 8 and 9, which we dropped. So we don't really think there's much of a dispute left there, but we explained why we don't think a judgment is appropriate.

And then also they moved for summary judgment of all of the system claims, and those have never been at issue in this case or any other case, and that's all laid out in the briefing.

THE COURT: So has Valtrus asserted the system claims against any of Vertiv's customers?

MR. HOUGHTON: We never have. We never will.

THE COURT: Okay. All right. Tell me -- obviously, Valtrus is seeking realignment. And if granted,

that would give you the opportunity to put on your side of the case first.

What would that look like?

MR. HOUGHTON: Sure, Your Honor. So that would start with an introduction to the patent, where it came from, how it was acquired by Valtrus from HP, some of the invention story background. There were depositions of the inventors here. We have documents from HP. And then we'd put on our infringement case. We did an opening expert report on infringement showing how these products can be used to infringe. We have the burden to prove infringement even though we don't have an affirmative infringement claim in the case.

There's Supreme Court law on that. Vertiv made very clear they expected us to do the opening report on infringement, not for them to do an opening report on non-infringement. They didn't do non-infringement contentions in this case. They wanted to wait for us to do infringement contentions.

So in our view, this is just a normal case that would present a normal way. There's obviously no damages, but the remedy at issue in the case doesn't really have anything to do with the order of presentation in our view. It's -- the most logical way for this to proceed is the way every other patent case that the Court has ever tried

should proceed, with the party owning the patent, presenting the patent, and presenting the infringement case, and then they can come up and do their non-infringement case, along with their invalidity case, and then we can respond.

THE COURT: And your infringement arguments would focus on the way in which you understand the accused products are used by customers?

MR. HOUGHTON: Yes, Your Honor. We're focused on two specific modes of operation of these products, and so the infringement finding we're looking for is if a customer, whoever it is, since they won't tell us who any of them are -- if any hypothetical customer uses these products and these modes, they necessarily infringe the patent. And that way there could be a verdict here that's actually meaningful because that would have preclusive effect against anybody who uses those modes of operation.

THE COURT: Those are the modes that are identified in your verdict form, Teamwork Mode 2 and 3?

MR. HOUGHTON: Yes, Your Honor. So Question 2A in our verdict form is Teamwork Mode 2, and Question 2B is Teamwork Mode 3, and those are the two modes that we are accusing of infringing in our opening report when used by a customer.

THE COURT: You phrase that as necessarily

infringing in your Questions 2A and 2B, whereas your Question 1 is just in terms of whether the accused products could have been used to infringe. What's the thinking in the difference in those questions?

MR. HOUGHTON: So I think Question 1 was designed to be more of the typical infringement question this Court has on its verdict form, obviously adjusted for the fact that this is not a typical case and that we're not talking about did it actually infringe because we're not talking about products infringing a method. We're talking about hypothetical. Could it have been used to infringe?

We think Questions 2A and 2B are actually better questions, but we weren't super confident that we were going to necessarily be able to get there since the verdict form seems to be pretty set. But we think 2A and 2B would be the better questions to ask here because they would actually have meaning in some future dispute.

If a customer used Teamwork Mode 2 at all, then it necessarily infringed, and that's the way Vertiv has been presenting this case all along to the Court, that these products can't be modified -- the software can't be modified. If a customer uses it, they infringe. If a customer doesn't use it, they don't infringe. There's no way that, according to them, a customer could have been using Teamwork Mode 2 but have somehow changed it so it

wouldn't infringe. And so what we're asking for in 2A and 2B is a finding that if a customer did, in fact, use Teamwork Mode 2, they infringed.

THE COURT: You know, the way you have written that it would appear to raise the bar for your side in that you're not being required to prove that the customer could infringe. You're setting it up as that the use in that mode necessarily does infringe.

MR. HOUGHTON: Yeah. And I think we're getting this from the representations they made to the Court. So I think they would -- you know, they should agree that if the customer used this mode, then they infringe. It shouldn't really be disputed. They shouldn't be able to make an argument that the customer -- oh, they might have changed their source code, so even if they used Teamwork Mode 2, they didn't infringe. If you look back at the hearing transcripts, they have very, very affirmatively disclaimed that position.

So we don't really think there should be any dispute about that. To the extent there is a dispute about that, then I think we'd want to go with Question 1, just could it have been used to infringe? It seems less useful to get a hypothetical judgment that it could have been used to infringe, and, like, going to trial didn't really accomplish much if that's all we get out of it for either

side, but that -- that's our thinking on it at least.

THE COURT: All right. Thank you, Mr. -- is it Houghton or Houghton?

MR. HOUGHTON: Houghton.

THE COURT: Houghton. It's neither of the above, okay. Thank you, Mr. Houghton.

Mr. Schwartz? First off, Mr. Schwartz, do you believe that we have identified the appropriate motions to capture this issue, the two motions for summary judgment that Mr. Houghton referred to?

MR. SCHWARTZ: Your Honor, respectfully, we would just add one more to it, which is the motion to strike Dr. Pokharna's opinions where we have set forth the issues addressing the claim construction or claim rewriting that he did.

THE COURT: That's at Docket 264, I think?

MR. SCHWARTZ: 260 -- yeah, 264, Your Honor.

THE COURT: All right.

MR. SCHWARTZ: But we believe those two and this one would -- are the most needed for resolution of all of those issues.

THE COURT: Talk to me about what claims should be presented to this jury.

MR. SCHWARTZ: With --

THE COURT: Is there a reason to go beyond the 1

through 7 that Valtrus says are at issue?

MR. SCHWARTZ: No, Your Honor, there is not.

THE COURT: Okay.

MR. SCHWARTZ: We just wanted to be sure. We have not heard from Valtrus, other than Mr. Houghton saying here that they never will assert those claims against Vertiv, and I assume that would also be against its customers. We have not received a covenant not to sue like we have for other patents that we have resolved between Vertiv and its customers, and that's why those remain, at least for the briefing purposes, live issues.

THE COURT: You do not have any basis to dispute that they have never asserted the system claims against your customers?

MR. SCHWARTZ: That's correct, Your Honor.

THE COURT: Which would seem to me to be necessary to the -- to the standing to present that issue at -- as a declaratory judgment.

MR. SCHWARTZ: Your Honor, my co-counsel, Mr. Maloney, did remind me that the original demand letters and licensing letters that were sent by Valtrus to our customers generally assert infringement. They may have identified a single representative claim, but they have not in any way suggested that all of the claims were not somehow infringed or subject to their licensing and

enforcement campaign.

THE COURT: What you're saying is they identified the patent but not the specific claims?

MR. SCHWARTZ: Correct. Where they identified "a" claim but said generally that is -- it is not limited to "the" claim that they identify in the letter.

THE COURT: All right. Tell me what you see as the weakness in allowing Valtrus to present its infringement case before your non-infringement case.

MR. SCHWARTZ: Your Honor, I believe Mr. Houghton said that it should proceed that way because this is like every other case this Court has ever tried. This is not like every other case this Court has ever tried. In every case that Valtrus has relied upon and identified, it is the traditional case where the patent owner has an affirmative claim for infringement and damages against some Defendant or a declaratory judgment plaintiff. That doesn't exist here.

The reason we are here is because Vertiv brought these claims, and Vertiv has been the one who needs relief from this Court. And without Valtrus asserting an affirmative claim, there is no reason for them to get the first crack at it and to tell their story. There is nothing that is confusing, especially in this particular instance, Your Honor, where this '287 patent emerged from a

joint development agreement between Vertiv -- Vertiv's predecessor, Emerson Power, and HP. Vertiv was there at the beginning of this story, long before Valtrus was. And so for us to tell that story and the '287 that emerged from it is equally appropriate, if not more so, in this particular instance where there is no affirmative claim by Valtrus against Vertiv.

THE COURT: So what does your presentation look like if Vertiv goes first?

MR. SCHWARTZ: So we would also tell the story of what was happening in the state of the art in data center cooling. We would also tell the story of the joint development between Vertiv's predecessor and HP that led to the '287 patent.

As counsel for Valtrus mentioned, we have deposition testimony from two of the inventors -- the two inventors that would tell that story. And then we would go into the invalidity case. And we would tell the story about why these claims are -- have no innovation whatsoever, especially as compared to Vertiv's own technology. And we would tell the story of Vertiv's development of its technology, which goes back into the '80s, of these -- of the products and systems that invalidate, which are the subject of also our summary judgment motions. And we would tell that story to the jury

as the opening of this case.

They would then respond to our invalidity case -- oh, I'm sorry, Your Honor, we also have the license defense which that joint development agreement and that joint development program between Vertiv's predecessor and HP which led to the '287, there's a license grant in there where Vertiv is licensed. That is also an issue on which Vertiv has the burden of proof and would flow very nicely from that story in our case-in-chief.

THE COURT: I didn't see that -- the word "license" mentioned in your second amended complaint.

MR. SCHWARTZ: Your Honor, it is a -- it is a non-infringement defense to an allegation of infringement, and so license would be included within non-infringement. But we have the burden of proof on that.

THE COURT: So why didn't you mention that in your amended complaint?

MR. SCHWARTZ: So the -- we identified the specifics of the license at -- around that same time, as set forth in the briefing, that -- the HP license around the same time as the second amended complaint. We at that time in -- I believe it was October of last year identified that as an issue, raised it with Valtrus, and they were fully aware of the license issues. I even had a conversation with counsel for Valtrus about it right around

that time of the depositions of the HP witnesses. We didn't believe at the time that we needed to amend the complaint because it was subsumed within the non-infringement allegation. But if Your Honor -- as we said in our papers, if we -- if Your Honor would like us to, we believe it would conform to the facts of the case as we get ready for trial.

THE COURT: I just -- I don't understand how you can have -- rely upon a license and not have pled it.

MR. SCHWARTZ: We believe -- as with any non-infringement defense, license is part and parcel of a non-infringement allegation, and we have -- obviously, our claim for non-infringement, it can include the technical manners of which we don't meet the limitation of the claim and also license.

THE COURT: Well, I mean, there are all kinds of reasons why someone might not infringe, and license is a specific one of them. I'm not impressed by the argument that you should expect a license defense when you see non-infringement.

MR. SCHWARTZ: Your Honor, I guess I would also suggest that with respect to the license defense, Valtrus hasn't identified in any way any other discovery or anything that it would have needed to address this issue, such that the license grant itself is straightforward, is

easily understood. There -- I'm sorry.

THE COURT: So why wasn't it the subject of your complaint? Is it -- were you unaware that you believed there was a license?

MR. SCHWARTZ: We became fully aware of the license through -- oh, yeah. You know what, Mr. Maloney has worked on these issues and was prepared to argue the license issue, so I will turn it over to him, if it's okay, Your Honor.

THE COURT: That's fine, Mr. Schwartz.

MR. SCHWARTZ: Thank you.

MR. MALONEY: Thank you, Your Honor.

Agreements that the license claim stems from go back to the year 2000 -- December 2000. And we learned of them -- it's a [redacted] license, broad in scope. We believe it applies to this patent, but it was a very long time ago. The people that were involved are not even at Vertiv anymore.

So we learned of the license through a third-party subpoena of Hewlett-Packard. And in mid-October, Hewlett-Packard produced these project agreements from the DataCool Project it was called. And that was, I think, October 19th or so we received the agreements. We reviewed them. We discussed them with Vertiv. And we saw the license issue, and we promptly deposed Hewlett-Packard on

October 31st. We confirmed that these were actual authentic agreements, and we confirmed importantly that there was no evidence that either agreement had been terminated, which was relevant to the substantive license claim because we needed to show that this patent was applied for during the time that this agreement was in force, and, in fact, it was.

The other thing we needed to confirm was that the parties to the agreement, the party named Emerson Energy Systems -- and I do know we have a typo in our brief on this. We call them Emerson Network Systems. It's actually Emerson Energy Systems, Inc., was the party that contracted with HP. After the HP deposition, it took about two weeks to confirm through various files the succession from Emerson Energy to Vertiv. And that ended up being very simple.

Emerson Energy Systems merged into Liebert Corp. And as the success -- as the surviving entity, Liebert Corp obtained all the rights and obligations of Emerson Energy.

And then in, I think, 2018 or so, Liebert Corp changed its name to Vertiv. We had all that in hand by November 19th. On that day, we produced what I just described, the corporate succession documents, and we supplemented our interrogatory answer. They had served an interrogatory about the basis for non-infringement, and we

laid out in detail our license defense citing to the agreements, the corporate succession, that this patent relates to that project.

And we felt that as a declaratory judgment Plaintiff seeking a declaration of non-infringement, that that was sufficient notice.

And as Your Honor is aware from the case law, we -- although we may have -- if you feel we needed to plead it, we certainly respect that. We felt that -- we didn't find any cases on point. The cases they cite in their brief are affirmative defense cases under Rule 8(c), which, you know, are certainly relevant but not --

THE COURT: Mr. Maloney, I'm sorry.

MR. MALONEY: Yes, sir.

THE COURT: Did you find any case law that indicated that pleading non-infringement encompassed a license defense?

MR. MALONEY: We didn't find cases either way in the context of this case where a declaratory judgment Plaintiff pleading under Rule 8(a).

THE COURT: Give me any context. I mean, did you find in any context a situation where a Court said that pleading non-infringement encompassed a license defense?

MR. MALONEY: Well, again, no, Your Honor, no. But the majority of the cases on this issue are affirmative

defense cases under Rule 8(c), which as Your Honor knows lists license as something that has to be pled specifically as an affirmative defense. We didn't have a claim against us to defend. We didn't have an affirmative defense. This was a -- a DJ Plaintiff seeking a broad declaration of non-infringement. We specifically said in our interrogatory answer that a basis of our non-infringement claim in this case includes the license claim, and then we laid out the particulars of that claim.

THE COURT: And that was served --

MR. MALONEY: On November 19th, Your Honor.

THE COURT: -- on November 19th.

And what was the discovery -- the fact discovery cut-off at that time?

MR. MALONEY: At the time, I believe it was -- well, I'm going to answer your question in two parts. I think at that moment in time, there was a couple of weeks of fact discovery left, but then Your Honor issued an order extending fact discovery to January 26th. So it was more than two months from the time that we provided formal notice of this claim for Valtrus to take any and all discovery that it felt it needed. We had already deposed HP, and Valtrus participated in that deposition. The inventors were deposed, and they were asked questions about this project. Both parties had a crack at both of the

inventors. All of the documents related to the DataCool system had already been produced in discovery. Of course, the patent was already in the case. And there was no additional discovery ever identified by Valtrus that it needed to pursue relating to the license defense.

As we put in our papers, we also offered Mr. Broxterman, Vertiv's in-house counsel, as a 30(b)(6) designee, as their notice topic of license issues, and the parties agreed to schedule that deposition. And a couple days before the deposition, Valtrus decided to not take it.

So they haven't identified any discovery that they needed or attempted to obtain but were unable to obtain, and the nature of the issue doesn't require any -- any additional discovery. The issues are simple, applying the language of the contract to the facts.

And the sole issue, in our view, relates to the scope of the license clause itself. [redacted] We believe that's the only issue that needs to be addressed by the jury.

And our position is that the [redacted] On that issue, our expert issued a report where he compares the [redacted], and their expert responded to that. So the parties have fully developed this issue.

They have raised in their summary judgment motion some contract interpretation-type issues that this Court -- which have been fully briefed and this Court can address. We believe that they're just simply misreading some of the key language.

But to the extent that the Court finds there's an interpretation issue there, it doesn't require any discovery. It's simply applying the plain meaning of the contract in the context of the contract as a whole.

So there's no prejudice whatsoever to Valtrus. They haven't identified anything that they would have done different had we amended our complaint. And I -- and I acknowledge that, you know, maybe it was a close call. We didn't find any case law that indicated to us that we needed to as a DJ Plaintiff, and they haven't cited any either that's in this context. And so --

THE COURT: Can you point to the part of your second amended complaint that you think best could be understood to encompass this license issue?

MR. MALONEY: I'm not sure if we have it here, but it would -- what I was referring to, Your Honor -- I mean, I'll acknowledge, the word "license" is not in there. We will not -- I don't believe we were aware of this at the time that that complaint was filed.

Our position is that by the -- by seeking a

declaration that Vertiv's products do not infringe the '287 patent, that that would encompass non-infringement due to a license because Section 271, the infringement statute, defines infringement as whoever, you know, performs the 271 acts without authority. And Vertiv -- and our position is Vertiv had authority to use the patent by virtue of the license.

I don't have the document, but I'm familiar with it. It --

THE COURT: Well, I -- Paragraph 85 is the --

MR. MALONEY: Yes, I have it now, Your Honor. Thank you.

THE COURT: All right.

MR. MALONEY: So we were seeking a declaration of non-infringement for the patent, literally doctrine of equivalents. And, of course, if we have a valid license, which we believe we do, we can't possibly infringe the patent. That's what we set forth in our interrogatory answer. Valtrus never responded by saying, well, you know, you need to plead this. It never was an issue until we got their summary judgment motion.

The parties proceeded as if the license claim is in the case. And we cited case law in our papers that when you provide formal notice, which we did, with enough time so that there's no prejudice to the other party, that the

claim isn't waived. And we believe we satisfy the good-faith factors to allow an amendment at this point. And we also believe that the pretrial order would subsume the pleadings. And so it's really an issue of whether Your Honor believes the issue was waived, in our view.

THE COURT: Well, the pretrial order would supersede the pleadings if there's no objection.

MR. MALONEY: Yes. And I understand they're objecting.

THE COURT: Paragraph 85 where you assert your non-infringement position does say that you don't infringe, but it goes on to say because, and it states the reasons, which don't encompass license, but...

MR. MALONEY: If I may, Your Honor, Paragraph 86 following that says for -- for at least these reasons. So it was not intended to be only the reasons, and the relief that we're seeking in the prayer for relief is broad.

THE COURT: So, Mr. Maloney, what surprises me is this is an issue that you've looked at, whether you needed to amend your pleadings, and you decided you didn't, even though you found no case law supporting that. Why would you not seek leave?

MR. MALONEY: Your Honor, if I could do it again, I would. I'll be candid with you, because it's really -- and I don't want to diminish the importance of the

pleadings and following the procedures, I totally get that. But it as never -- it never seemed to be an issue. We brought this up. We amended our interrogatory. The parties took the discovery that they agreed to take. They never once said this comes too late. We have discovery we want to take, and now, you know, we're not going to have time. And so we didn't -- it really didn't hit our radar that -- that this was something that they felt was now part of the case. And so we looked at the case law, and we tried to find cases. And what we saw was we didn't -- the cases that we saw were affirmative defense cases, and they didn't have a claim -- there was no claim against us that we could plead an affirmative defense to.

And this was at the time -- there was a lot of moving parts in this case with their assertion of a counterclaim and then withdrawal. And I'm not using that as any sort of an excuse. I'm just being upfront with the Court, that we looked at it and said, well, we don't have an affirmative -- we don't have a claim that we can file an answer to as an affirmative defense. And so are we okay as a DJ Plaintiff, and we felt we have pled non-infringement broadly, and we are specifically supplementing our interrogatory answer to say one basis of our non-infringement claim in this case is the license, that that's what our -- the interrogatory we supplemented was a

contention interrogatory on the basis of non-infringement. And we felt by doing that, we had put them on notice. And we never heard anything about it.

We offered our -- we offered our in-house counsel as a 30(b)(6) witness on license. The parties were acting as if this was in the case, and it wasn't until we had their summary judgment motion that, you know, this became an issue. Had they told us at the time we really think you need to plead this, show us your case law, I think we probably would have made a different decision.

And I can't -- I can't go back in time and take that back. I'm just trying to be upfront with the Court as to what we were thinking. We were not trying to get away with anything. We felt like we fully disclosed this, and it's a very narrow, straightforward issue. It's applying some language that does have a factual component because the license is [redacted] And so that's where the effort was.

We developed the expert opinion on that. They responded to it. We took some depositions, and we thought this issue has been fully litigated, and then we get their summary judgment motion.

THE COURT: Does the license use [redacted]?

MR. MALONEY: Yes. The actual language, Your Honor -- and I have a slide on this if you want -- I don't know if you want me to go into the next level. I have a whole presentation. But the actual language is it applies to -- [redacted] That's the actual language.

The [redacted], if I could just give you a little more context. The story here is that in 2000, Emerson was a leader in data cool -- data center cooling systems. HP was a leader in large servers and large computer systems. The two companies got together to take advantage of the synergies between those two realms of expertise. [redacted]

[redacted]

[redacted]

[redacted]

The patent -- the '287 patent is essentially -- the drawings of the patent, Figures 1, 2, and 3, are the drawings of the DataCool system. They're identical. And the patent says right in it that these heat exchanger units that are shown in the '287 patent are -- can be DataCool units in a preferred embodiment. And it specifically refers to Liebert Corporation, which had become Liebert at the time, as the provider of these units.

And so this is really all about, in our view, a case that never should have been brought [redacted] The two inventors were involved in the project. They wrote papers about it. They talked about the DataCool system. They used the same drawings in their papers as they put in the patent.

And so that's why I say the real issue here was this factual issue of whether it's close enough to be considered related, and that's what we thought was the dispute between the parties, not that we hadn't pled something or that they were unaware of the claim. And, again, there were two months left of discovery. We took the same discovery. We deposed the inventors. We offered

Mr. Broxterman, if they wanted a 30(b)(6) on it. We both deposed HP. We both had all the technical documents about the DataCool system.

It's well understood, and there's no disputes there. And so that's maybe a very long-winded answer to your question, but that's the key issue, [redacted]

THE COURT: And does Vertiv have a motion for summary judgment on this license issue?

MR. MALONEY: We do not because we believe that -- what I just described is a fact issue of w[redacted]. I don't have -- I don't believe that Valtrus has stipulated to that. They brought a summary judgment motion saying, number one, the claim has not been pled, therefore, it's not in the case.

And, number two, they have raised, I think, four contract interpretation-type issues that they believe defeats our license claim, none of which have anything to do with whether [redacted], it's -- that there were [redacted], that the patent -- that the [redacted], issues that are just based on the language of some other provisions in the contract. And those have been fully briefed in their pending summary judgment motion.

And so our view, Your Honor, is that we believe

Valtrus is incorrect in the way they're reading those other four provisions. And that if the Court were to rule in Vertiv's favor on that, the only issue for the jury would be is this [redacted] such that it's subject to this license agreement?

THE COURT: All right. Thank you, Mr. Maloney.

MR. MALONEY: Thank you, Your Honor.

MR. HOUGHTON: Your Honor, Connor Houghton again for Valtrus.

There's a couple of things there, and I think Your Honor was right on the issue at the beginning of that before we heard about all of the merits. They didn't plead this claim. They pleaded non-infringement, and they pleaded invalidity.

License is not non-infringement. Rule 8 says if you have a defense of license, you have to separately plead it. They want to say that they can have an affirmative claim of license without pleading it. And the reason there's no cases is because nobody's ever even thought that could possibly be true.

THE COURT: Tell me, Mr. Houghton, what -- what was your response when they amended their interrogatory answer in November to refer to this license issue?

MR. HOUGHTON: So they did that on -- it's not true that there was discovery left. That was the last day

of fact discovery at the time. Fact discovery got extended later. So for one, it was the last day of fact discovery. There was nothing left to do.

The second and more important point is they amended it on November 19th. The HP depositions took place in October. They apparently knew that they were going to try and make this license argument when they went in and took an HP deposition of the HP witnesses. They didn't tell us. We didn't know. HP produced thousands of documents in this case. They apparently went through there, found this license, and then spent the whole deposition asking about it. We had no idea going into that deposition they were going to do that.

THE COURT: What makes you think that they knew about it at the time of the deposition? Are you saying they asked HP about it?

MR. HOUGHTON: Yes, Your Honor, they asked HP about it. They didn't tell us in advance. They never amended their interrogatory to say we have a license before we took these depositions. At that point and at this point, there's no license claim in the case. So they say we could have taken more discovery in the two months after they amended their interrogatory response. That would have required us going back to a third party, HP, and saying, hey, they now say they have a license claim. I know we

already did three depositions of you for three full days and you produced thousands of documents. We want to reopen all those depositions for a claim that's not in the case. I mean, you can imagine what our subpoena would have looked like. It would have been a second subpoena to the same company on a claim that's not in the case.

Of course, HP would have moved to quash that. We're not going to put up another witness about a claim that's not in the case.

THE COURT: What is your response to their argument that the license applies?

MR. HOUGHTON: On the merits?

THE COURT: Yes.

MR. HOUGHTON: Our response on the merits is that the license was in 2000. [redacted] They apparently think they can merge with a company, acquire license rights, make brand new products that have nothing to do with the old products,

and then have a license to those products [redacted] And that just is not what this license says at all. It's not even close. And that's why we moved for summary judgment on the merits.

But I think the procedural issue is a big problem. And if there are fact issues here, we were significantly deprived of discovery. They said multiple times that we didn't point to any discovery we would have taken, and that's just flat out wrong.

Docket 302, Page 3, we have a whole paragraph about the discovery we wanted. Critical testimony from Emerson and HP who negotiated and signed the agreements. Nobody who negotiated or signed the agreements was deposed in this case.

No documents -- Vertiv produced no documents. They admitted and they relied on the fact that they didn't even have a copy of this license in their files. So there was not a single document produced from Vertiv in this case about the license.

THE COURT: So if the Court takes the position that the license issue is not properly in this case because it was not pleaded, that would mean that it's still an issue that's out there that could be raised in other litigation between Valtrus and Vertiv, wouldn't it?

MR. HOUGHTON: I think it would be a compulsory

claim that they needed to bring in this case. I don't think they can raise a second claim on this same issue that could have been raised in this case.

THE COURT: Obviously, if they obtain the declaratory judgment of non-infringement that they're seeking, then I guess they wouldn't need the license issue. But if they don't obtain that, it would be your position that they would be barred from raising the license issue in other litigation?

MR. HOUGHTON: I think that is right, Your Honor. I don't see how it's not a compulsory claim that needed to be brought. They could have amended, and they still haven't tried to amend. I think that's an important fact. You asked them why they didn't amend. I think it's because they knew they were never going to win a motion to amend at the time that they would have filed this.

The five factors, we laid them out in our brief why they can't do it. They still haven't even filed that motion, and the reason is it's not even close.

THE COURT: And you have a specific recollection that November 19, the day they served the amended answer to their interrogatory, was the then existing fact discovery deadline?

MR. HOUGHTON: Yes, Your Honor. Then we came here the next day, we were in this courtroom. They didn't

mention anything about this license when we were standing here in court. They could have done it. They could have asked to amend. They could have said, hey, there's this late-breaking license issue that we just found out about. I know we didn't plead it. Can we raise it in this case? And they didn't do that. We were standing here for three hours talking about other things the day after this happened, and Your Honor did extend fact discovery at that hearing.

But, of course, this claim wasn't in the case. So whether there's fact discovery ongoing or not, what we would have had to do is serve subpoenas on a bunch of third parties about a claim that's not in the case. I don't know what we could have even possibly pointed to. This license is confidential is another problem, so we can't just go talking about it with people.

And then the last point is they say they offered Mr. Broxterman as a 30(b)(6) witness. They've admitted multiple times they don't have any knowledge of this. So if we take a 30(b)(6) deposition of someone who doesn't know anything about this, we're just opening the door for him to suddenly create knowledge like an expert witness? This is one of our witness objections is that any testimony from Mr. Broxterman about the license is improper because he would have only gained that through his role as managing

this litigation as an attorney.

Even if they had served a Rule 26(a)(2)(C) disclosure for him, that would have been improper. You can't pick up a piece of document discovery in litigation, study it, and become an expert -- a non-retained expert on it. That's an issue Your Honor has dealt with many times.

THE COURT: Mr. Houghton, I'm assuming -- and I'm kind of shifting issues now, but I'm assuming that Valtrus does not dispute that there is a live non-infringement issue that is proper to present to a jury between Vertiv and Valtrus.

MR. HOUGHTON: Apart from our objections to jurisdiction, there is certainly a claim in this case for non-infringement that we tried to dismiss unsuccessfully, and that claim is a technical claim about whether the products can be used to infringe or not. It's not a claim about license.

THE COURT: I do understand that. All right.

MR. HOUGHTON: And just one last point, Your Honor. To the extent there's any possibility this license issue is going forward because there's -- you looked at our summary judgment motion, you decide, hey, they should be allowed to pursue this claim, also, you're wrong on the merits, and there's fact issues, we need fact discovery on this, and that is going to postpone things by a lot. Like,

we need to be able to go back and ask all these people that we didn't ask before all this background information to address the fact issues that could be possibly left. And we don't think we should even get close to that because it's not in the case. Even if it is in the case, it's very clear that they lose on merits to us. That's why we move for summary judgment. But to the extent that motion is denied and you decide this issue can go to the jury, we need to reopen fact discovery.

THE COURT: Well, I can tell you, Mr. Houghton, that I definitely lean to the position that it should have been raised in the pleadings. But I am also concerned by your position that if it is not allowed to be asserted in this case, that it is foreclosed and -- because that's a fairly draconian penalty for not raising it in the proper way on a timely basis.

MR. HOUGHTON: Well, Your Honor, we do have all these cases against the customers that Vertiv is not a party to, and so the customers can raise a license defense in those cases. It's not adjudicated here.

There's also another case between Vertiv and Valtrus pending in this court that they filed recently, a second declaratory judgment case. And to the extent the concern is that they should be allowed to pursue this license claim somewhere, that's an option. We obviously

don't think it makes a lot of sense to have two separate cases addressing this, but that's out there.

THE COURT: All right. Thank you, Mr. Houghton.

MR. MALONEY: If I may very briefly, Your Honor.

THE COURT: One thing that I would like you to address, Mr. Maloney, in addition to whatever response you have, is the issue of whether the license defense is -- or license issue is important enough to you to justify a further delay of the trial.

MR. MALONEY: Well, we think it is a very important issue, Your Honor. It not only affects the rights between Vertiv and Valtrus, but as you've heard, they recently sued 10 more customers on this very patent.

And just to go back and set the context, again, this license was entered into in 2000. It wasn't in Vertiv's files anymore because it's so long ago, but it was sitting right in HP's files.

When Valtrus purchased these patents in 2021, they had a right to ask HP for any licenses that apply to any companies that they were interested in pursuing. They never asked about this license.

THE COURT: Of course, their position is that the license has expired.

MR. MALONEY: Well, they didn't even ask if there are any licenses that apply under this patent to Vertiv.

And so when we learned about it for the first time on October 19th, the only -- we had -- we had a little bit more work to do. We had to take the HP deposition to determine [redacted] We had to confirm that fact, and we did at the deposition.

THE COURT: Did you --

MR. MALONEY: And then --

THE COURT: Did you disclose to Valtrus at or before that deposition that you believed you had a license or had found a license that was applicable to these claims?

MR. MALONEY: I don't know if we verbalized it to them, but they received the same production we received, which included the two agreements. We then marked both agreements at the deposition and asked the witness questions about authenticating the documents, any other documents relating to this, where did it come from, what did they know about the project, and then specifically do you have any evidence that [redacted] And the answer was no. And if we had that evidence, it would have been in the same files, and we would have produced it. So that was a very important fact that we needed to confirm, and that was

October 31st.

Then we had to confirm how does Vertiv relate to Emerson Energy Systems, and it took us a couple of weeks working with Vertiv's in-house people to uncover those records. That's what we -- I got those records on November 19th, the afternoon of November 19th. We produced them and supplemented our interrogatory response on the same day, laying out the license defense and the records.

And just to be clear, if I misspoke -- I think I might have misspoken earlier. On November 19th was at the time the close of fact discovery. But on the same day, Docket 219, fact discovery was amended to November 24th, which is just a few more days. I think we had some additional depos to get done between the parties. I think that was by stipulation.

And then on -- a week later on December 30th, this Court amended the DCO to extend fact discovery to January 26th. So there were essentially two more months to take any discovery they needed.

The other thing I'd like to add, they have some sort of cooperative relationship with HP. They bought the patents from HP. They're getting third-party declarations from HP in the context of their expert's work. There's testimony in the record that lawyers for Valtrus interviewed with -- sat in on interviews between their

expert and one of the inventors who is still employed by HP.

So it would -- it would certainly have been within the realm of feasibility in those two months for Valtrus to get any other information it thought it needed from HP, take any other depositions.

Yes, they say in their brief, here's all the discovery we would have taken. But the fact is they didn't pursue any other discovery during those two months, not a single deposition, no third-party subpoenas. There was no discussions with us about, well, gee, now that you're claiming this issue is in the case, we're going to have to think about the schedule because we're going to need more discovery. None of that occurred. The first we heard that they're treating this as not being in the case was when they filed their summary judgment motion.

And so to answer your question, it is a very important issue. We very much prefer to try it in this case so we don't have to try it in a subsequent customer case, which is inevitably where this would go, because it is a very legitimate defense.

HP owned this patent for 20 years before it sold it to Valtrus. HP does business with Vertiv. HP buys the very cooling products that are issue from Vertiv. HP never once suggested Vertiv was in violation of this patent.

And so that's the overall circumstance. I recognize the procedural issues. I take them seriously. We certainly don't want to lose our trial date, but I think any additional discovery would be very, very narrow. I don't even know what it is, because in the two months they had to do discovery, they never once raised a single issue. And we were very active in discovery, working closely. I think we've had a good cooperative relationship with each other.

THE COURT: I do understand that.

MR. MALONEY: Okay.

THE COURT: But I think that it is so clear to me that you had an obligation to include this issue in your pleadings that I understand why they would not want to engage in discovery on it and appear to waive their position that it's not in the case.

MR. MALONEY: Can I just have one moment, Your Honor?

THE COURT: You can have 15 moments. I'm going to take the morning recess.

MR. MALONEY: Thank you. Thank you, sir. Thank you.

THE COURT: And when we come back, we'll pick up.

And what I would like you to do over the recess is make a decision about whether you oppose extending the time

to allow that license issue to be properly joined in the case, and I'm not assuming that Valtrus agrees with it, but I do believe that it's an important enough issue that if Vertiv wants to include it in the case, that I would grant that, especially because we don't have a current trial date. So think about that, and we'll take it back up in 15 minutes.

MR. MALONEY: Thank you. Thank you very much, Your Honor.

COURT SECURITY OFFICER: All rise.

(Recess.)

COURT SECURITY OFFICER: All rise.

THE COURT: Thank you. Please be seated.

MR. HOUGHTON: Your Honor, if I may real quick, we have one change to our -- what I said earlier.

THE COURT: All right. Mr. Houghton.

MR. HOUGHTON: I know we're still not going to agree on the ultimate disposition here, but I mentioned the compulsory counterclaim issue earlier, and we're not going to raise that. So we will not say Vertiv or the customers are precluded from raising this in any future case. And if I said that differently earlier, that's not going to be our position, and we stipulate to that.

THE COURT: All right. Thank you, Mr. Houghton.

Mr. Maloney?

MR. MALONEY: Thank you, Your Honor.

Vertiv would like the issue to be resolved in this case. Vertiv does not oppose whatever discovery the Court would deem appropriate to cure any prejudice to Valtrus. We think it should be limited, but obviously the Court can decide what's appropriate. We don't oppose discovery.

THE COURT: During the break, was there any discussion between the two sides about what additional discovery would be needed and how much time that might take?

MR. MALONEY: Very briefly, counsel mentioned they may want to pursue a deposition of Hewlett-Packard. Hewlett-Packard was already deposed once in this case. Both parties actually served subpoenas. They were very cooperative. They produced documents, including these agreements, and they produced one of the inventors who is still employed there. And they produced Mr. Grant Ritz as a corporate witness.

All of that, just by my memory, occurred in a very short amount of time, like, relatively speaking, 30 days or so from the time the subpoenas issued until the time we finished the depos. So that's -- kind of the time frame we're thinking is 30 days, something like that, maybe a little bit longer if they need more time, but that's what we discussed.

THE COURT: And is the license issue that you've raised and set out in your amended interrogatory answer all tied specifically to one written agreement? In other words, is it focused?

MR. MALONEY: Yeah -- well, there are two agreements. What appears to have happened is the project occurred -- the first phase of the project was the year 2000. [redacted] So it's only -- it's just one document.

THE COURT: Well, I just want to make sure that if that claim is going to be allowed in the case, that either we get a written amendment to the complaint or we have a very specific oral statement of what the claim is today. And are you satisfied that what you just laid out encompasses the entirety of the written agreements that you would rely on for the license issue?

MR. MALONEY: Yes. The two agreements I just mentioned, which were also both identified in our

interrogatory answer, those are the two agreements, and those are the only two agreements that we are relying on for the license defense.

THE COURT: All right.

MR. MALONEY: If the Court believes we should provide a more detailed disclosure of sort of the basis, the arguments, we're happy to amend, if the Court grants leave, or to supplement the pretrial order in this respect. I think we've been pretty fulsome in our disclosure of the theories, but no issue there if the Court believes we should be more specific.

THE COURT: All right. And have you addressed in the briefing on the motions that we have referred to -- the summary judgment motions, have you laid out your position on this license issue completely such that that wouldn't need to be supplemented?

MR. MALONEY: I'm pausing for the following reason. As I mentioned before, we can sort of break it into two buckets of issues. One is the issue I mentioned before, the [redacted] That doesn't appear to be the issue they raised in their summary judgment motion.

And so our opposition mentions some of the basic

facts that show that [redacted], but it's really not our full effort on that because that didn't seem to be what they were challenging.

What they did challenge was whether [redacted] some other issues of that nature. We have fully addressed those in our -- in our brief.

So we've addressed all of the issues that they say in their summary judgment motion would cause the agreement not to apply here, but there's still the issue of -- all the evidence of whether [redacted] We have that -- that has been disclosed in our expert report.

Dr. Abraham served a -- in our opening expert report of Dr. Abraham, he addresses that issue because it's a technical issue of [redacted] And so that -- that's the disclosure that we've made in the case on that factual issue.

THE COURT: You know, the licenses are, I believe, treated as contracts, and the standard law on that is that the Court can decide most of the issues relating to a breach of contract. I understand that you can get to a fact issue that's sufficiently discrete that you could end

up having a need for a jury to determine that. But I haven't had a chance to look at these, so I'm not really sure.

MR. MALONEY: Understood, Your Honor. And I -- that's why I separated them into two issues. I think they have raised, I think, four issues that I would call more contract interpretation. They view the language one way. We view it differently. I think all of those issues have been briefed.

Our position is they're just simply misreading the contract, and you should reject their arguments. But if the Court believes these are legitimate ambiguities in the language of the contract, I think the Court can resolve those in the context of the summary judgment briefing.

The other issue, though, I do think because of the nature of how this license is structured, again, [redacted] And so that's a factual dispute. It's the only factual dispute that we believe the jury will have to decide.

And we have disclosed our theories and our evidence of [redacted] through the report of our expert and through the other evidence in the case, the patent itself, the evidence of what the DataCool system was. In

fact, we've also relied on the DataCool system as an item of prior art. And so it has been extensively discovered in the case as to what the DataCool system is. And that's the evidence we would present to the jury to show that this patent falls within the scope of the license.

THE COURT: All right.

MR. MALONEY: Thank you, Your Honor.

THE COURT: Thank you, Mr. Maloney.

MR. HOUGHTON: Your Honor, I sense you're leaning one way, but I am going to try to persuade you not to do that.

There's a lot of practical problems with bringing this claim back into this case. And I mentioned that HP produced a lot of documents and already produced several witnesses. They're not going to want to do that again, I can tell you that for sure. And HP is not located in this district. So we're going to have a subpoena fight with HP about getting more discovery in the same case that they've already spent a ton of time and produced a ton of documents. That's going to go to either California or some other district. It's not going to come here. And so Your Honor has no control over forcing HP to give us this discovery, which is --

THE COURT: I wouldn't say no control.

MR. HOUGHTON: That's the first practical problem

we see here.

The second issue is that to the extent we're going to go ahead and open this book back up and do all this discovery, it's certainly not going to be limited to what they just said. We would need third-party discovery from the people who are actually involved in this, which is not just the HP people that were already deposed. Different people signed this agreement. Different people negotiated this agreement. We'd need to go track them down and take them. We'd need more discovery from Vertiv. Like I said, they haven't produced anything about this at all. They haven't even produced the agreement. Apparently they don't even have it.

But certainly if they're going to have a witness talk about this license claim, we need discovery about that. We need documents about it. We don't have any of that, and this is going to take a long time. They mentioned there's expert reports. Those would need to be supplemented with whatever discovery comes from this. They have an opening report. We have a rebuttal report. That's all going to have to be reopened. This can all be taken up in a later case if we get to it. Like you said, this case could moot the entire issue one way or the other.

And to the extent this issue survives, it can easily go in one of these other cases. These are all

ongoing cases, and there's a pending MDL motion to transfer them all to this court, which we expect to be ruled on fairly soon.

THE COURT: Now, you have moved to continue this to consolidate it with new actions. So what is this -- what's the source of the urgency that I'm hearing?

MR. HOUGHTON: Well, that motion was denied. If this case is going to get consolidated with the other actions and put on that schedule, I think it's a different conversation about whether this license claim can go forward, because that's basically what we're asking Your Honor to do, to let them pursue it in these other cases. And to us it makes a lot of sense to do all these things together. We've been trying to do that throughout this whole case, get this to a practical place where it makes sense.

We still don't think this trial makes a lot of sense, especially if they want to bring this license claim that's really about a defense when there are no defenses in the case.

THE COURT: If I allow time -- well, first off, if I allow this license issue to be considered part of their position -- in other words, in effect an oral amendment to their complaint, I do want to hear from you whether you think there's some lack of specificity. In other words, do

you feel that you need to see it in writing as opposed to what has been stated here?

Secondly, how much time would Valtrus need to conduct discovery on it? And frankly, what -- rather than proceed directly to expert reports or anything else, what I would like to see is whether or not you want to amend your briefing on the motions. And I do think that that is something that I think would be the first priority for the Court on this license issue will be to decide the motions that are currently pending on it before deciding whether or not it will impact the trial.

MR. HOUGHTON: That is how we would propose proceeding, Your Honor, is to look at the motion on it.

Now, if you're going to say that they're allowed to amend their complaint, I think they should have to do that so we can see exactly what it is they want to plead, because right now we have a half-page interrogatory response. It doesn't really say a whole lot. The only way we know their position is in opposition to the motion we already filed for summary judgment.

And I do think this is largely a legal issue, which is why we raised it. But we spent a whole lot of briefing time and energy addressing the procedural problems with this, which sounds like you're probably resolving against us, unfortunately. But we could brief this more

discretely, again, once we see their amendment.

And I think the way to do it would be to let them to file a motion for leave to amend, or just let them file an amended complaint and then let us move to dismiss.

THE COURT: I don't expect the -- part of the amended complaint addressing license to be any more elaborate than what you've heard here, but I can understand the desire to see it in writing. And I'm willing to do that because I think they can very quickly file such a document.

So that'll take us back to this issue of how much time do you need to conduct any discovery? And if you run into problems with cooperation from HP, you need to bring those up obviously with Vertiv but also with the Court promptly, and we can figure out how to deal with that. But I -- I don't think that that will be a real obstacle.

MR. HOUGHTON: So, Your Honor, two points on that.

One is we do think it makes sense to resolve the legal issues in the summary judgment motion before we reopen this discovery because it might not be necessary if our position is correct on the legal issue, which is already briefed in the summary judgment motion. We can rebrief it again and make it more straightforward and easier, but --

THE COURT: Well, as long as you will not take the

position that the discovery that you're going to be doing requires revisiting these -- the determination of these issues.

MR. HOUGHTON: Well, the issue, Your Honor, is that there are threshold legal issues that are legal and we think can be resolved as a matter of law. If Your Honor resolves those against us, that's why we need the discovery, is to seek the facts that they say are in dispute that'll go to trial.

THE COURT: All right. As long as what you're saying is not if they're resolved against you, then you want to get the discovery and reurge them.

MR. BERKOWITZ: If I -- if I may, Your Honor?

THE COURT: You may.

MR. BERKOWITZ: Matt Berkowitz, Your Honor.

Just on that one point. If Your Honor denies the summary judgment motion, we would seek discovery, but we wouldn't reurge another summary judgment motion after that because that would mean there are fact issues. We just need the discovery in order to rebut the facts that they are asserting.

THE COURT: And which of the motions are you referring to when you say if the motion is denied?

MR. BERKOWITZ: It's 256, Your Honor.

THE COURT: 256?

MR. BERKOWITZ: That's correct. I don't have all the opposition papers and docket numbers, but that's the motion, is 256.

So the first half of that motion, Your Honor, is about the procedural issues, and then the second half is about on the merits explaining why -- and I think everyone agrees -- actually [redacted]

But it was actually not to Vertiv, it was to a predecessor company. And as far as we know, there's no evidence of an assignment that required it to be assigned.

THE COURT: But you're saying that the discovery that you will propose to take, if this license issue remains, would not affect your position on that Motion 256?

MR. BERKOWITZ: Not on the -- not on the legal issues and the termination points, Your Honor. I mean, effectively, what that -- just to summarize that motion, [redacted] There's a separate issue, which is whether this was ever assigned.

So there's no evidence of that. I assume if Vertiv had such evidence, it would have put it in in response, but there's a provision that this only applies to Emerson -- Emerson Network Power or whatnot. It's not an automatic assignment. It's a legal question. There's no automatic assignment on merger to a successor entity. It has to actually have been assigned and transferred. HP didn't license Vertiv. So there's that legal issue, too.

THE COURT: All right.

MR. BERKOWITZ: And that was just a burden issue. It's their burden on that.

THE COURT: Thank you, Mr. Berkowitz.

Mr. Maloney?

MR. MALONEY: Your Honor, we don't disagree that resolving these legal issues might be a prudent way to proceed. And they're actually quite straightforward in our view. One -- I mean, there's three of them. [redacted]

[redacted] And it allowed all of the acts under 271, make, use, sell, offer for sale, import, for any such IP rights for any and all methods and devices. So we think they are just very badly misreading the contract. We welcome your Court's resolution of those issues.

I haven't heard of any discovery that would inform any of those three issues. The only issue remaining is the issue that I've mentioned a few times, [redacted] We obviously know what the patent is. We have served an expert report on this very issue, and their expert addressed it, as well, in his rebuttal report.

So they keep saying they need discovery. They've yet to say what discovery they need and what issue it relates to. Again, we're not opposed to discovery, but this notion that it's going to throw this case into some sort of a protracted proceeding until we get all of this third-party discovery, I don't know what issue they're linking any of this discovery to. These are very straightforward contractual reading-type issues.

[redacted] The merger of Emerson into Liebert by operation of Delaware

law and Ohio law automatically, as the surviving entity, gives Liebert all of the rights of Emerson, the company that was merged into Liebert.

And the only other step to get to Vertiv is Liebert changed its name to Vertiv. All that information has been produced. There's nothing else to produce on that.

So I just want to give the Court that context. We welcome resolution of these issues. I'm prepared to argue them today. It sounds like the Court is considering another hearing in the future. If it makes sense to argue it there, we would -- we would ask for oral argument on this if the Court thinks it would be helpful.

THE COURT: All right. I will have to look at the briefing to determine whether --

MR. MALONEY: Sure.

THE COURT: -- argument would be helpful in addition to that.

I would like to turn now to the motions in limine. And I will say that my intent will be to issue a ruling on this realignment issue when we get the case set down for a specific trial date. And so I'll withhold that until that time.

But in looking through the motions in limine, it appeared to me that there were a number of issues that it

would be helpful to take up and get resolved today.

So let's start with Vertiv's motions in limine. Whoever wants to speak to those on behalf of Vertiv.

MR. DAVIS: Thank you, Your Honor. Bo Davis on behalf of Vertiv.

The first MIL that we have is actually -- I guess the -- we're asking permission to be relieved from one of the Court's standing MILs in a narrow situation. And that is that we would like to be able to provide context for why Vertiv brought this lawsuit and to be able to say that we brought this lawsuit as a result of Valtrus's enforcement activities with respect to customers.

So when we -- obviously, the Court's standing MIL on this is that the parties can't refer to other litigations or parallel proceedings and that kind of thing. So we're -- effectively we're asking for permission now. We thought it would be appropriate to raise it -- raise it now and get the Court's guidance on it as opposed to trying to raise it on the spot in the middle of trial.

But just to articulate, you know, what it is we envision saying about Valtrus's other litigations is that they sued our customers, and we brought a declaratory judgment action to clear the air with respect to those assertions. That's the sum of it, Your Honor.

And I don't know if the Court has any specific

questions, but that's where -- what we're asking to be able to do. I don't believe we're trying to do any of the things that Valtrus has characterized us -- characterized us as trying to do in terms of calling them a patent troll, calling them a -- anything pejorative. We just want to refer to the fact that they sent notice letters to our customers, and they, in fact, sued some of our customers, and that's why we are here.

THE COURT: I do think that it makes sense for Vertiv to be able to indicate that its desire is to get a determination of whether or not its customers can use its products without fear of infringing the '287 patent. So to that extent, my inclination would be to agree.

But what I'm wanting to find out is are you wanting to be able to say more in terms of who has been either the subject of letters or lawsuits and how many and the like or just the fact that you're here to get that determined?

MR. DAVIS: Primarily just the fact that we're here to get that determined, and we felt like it's going to -- like a necessary corollary of that is that we've been threatened, but I do understand the Court's point that, I mean, we could make it without it, but that's why we're asking permission to see whether or not -- how far we can go. We're looking for guidance to see, you know, can we

refer to the fact that notice letters were sent to customers. The particular customer I don't think is as important or -- but, you know, I mean, I think we do -- we -- where our natural inclination is to go is that it has -- they have sent letters to numerous customers and that there have been lawsuits filed against numerous customers, and that's why we brought this lawsuit.

And, of course, some of this, I think, depends on what claims remain, how the Court is going to decide the order of presentation of evidence, and I think it becomes more or less important depending on those things. But I do take the Court's point. I mean, can we say that our customers have been threatened without referring to lawsuits? We certainly could.

But the natural inclination is to go that next step, and we just wanted to get clarity from the Court about whether we have permission to do that or if the Court would view that as going too far.

THE COURT: All right. Thank you, Mr. Davis.

MR. DAVID: Thank you, Your Honor.

THE COURT: Let me hear from Valtrus.

MR. BERKOWITZ: Thank you, Your Honor.

I think from our perspective, we don't have a problem with Vertiv saying it wants a determination as to -- as to these issues, validity and non-infringement.

And I fully expect that Judge Gilstrap will -- will tell the jury what their role is in terms of that there is a dispute between Valtrus and Vertiv as to whether certain products are capable of infringing, whether this patent is valid, and that he can also inform the jury that the Court will fashion a remedy at the end of this.

I don't see any reason to talk about whether we have threatened their customers. That paints them as a white knight of some sort and us as a bad guy for no apparent relevant reason that I can see. I mean, this is standard practice, I think, and Judge Gilstrap has fashioned these standing MILs for that reason.

THE COURT: Now, in your briefing, you talk about wanting to put the settlement agreements -- settlement licenses before the jury.

MR. BERKOWITZ: That's right, Your Honor, for secondary consideration reasons. And --

THE COURT: And --

MR. BERKOWITZ: Sorry.

THE COURT: -- how does that not bring this same issue of lawsuits before the jury?

MR. BERKOWITZ: It doesn't -- I mean, it doesn't necessarily need to focus on the lawsuits. Like I said, the Court will -- can -- Judge Gilstrap can inform the jury that there's a dispute, and the dispute arises out of, you

know, different views on whether the products infringe and the patents are valid. That -- those license agreements are not particular to Vertiv in any -- in any way. They're not particular to any other supplier. They're standard agreements that come in, I think, in every case either because of damages or because of secondary considerations.

THE COURT: Well, when they come in, the other side typically wants to be able to point out that they were executed in settlement of litigation.

MR. BERKOWITZ: And they can do that, that's right. But I think that's different than talking about threatening. I mean, terms like "threatening" and things, I think, are pejorative in that way. Like, certainly Vertiv can explain that there were settlements of litigation. There's no question about that.

But the idea that Vertiv is in court as some hero to rescue its customers and that we have been threatening their customers in some kind of campaign, I think, goes beyond what's necessary or relevant here as it concerns explaining those agreements.

THE COURT: Do those settlement agreements have any relevance beyond secondary considerations of non-obviousness?

MR. BERKOWITZ: I think that's the relevance, Your Honor.

THE COURT: All right. Thank you, Mr. Berkowitz.

Let's talk about -- I think this ties in that -- the use of the settlement agreements, as well. How does that relate to this issue of what you should be allowed to tell the jury about prior litigation by Valtrus?

MR. DAVIS: Your Honor -- Your Honor, I think the confusion is just are we -- there are other MILs on that who other attorneys are arguing that, but -- and then there's also objections on the exhibit list about settlement agreements.

But, I mean, we don't -- Vertiv is not -- we're trying to keep settlement agreements out. We don't think they're relevant. We don't think they're -- and so is that what Your Honor's question is about?

THE COURT: If settlement agreements do come in, obviously that is going to relate to what the jury knows about --

MR. DAVIS: Yes.

THE COURT: -- action by Valtrus regarding this patent and your customers.

MR. DAVIS: Yes, Your Honor. Yes. And I think Your Honor's point is a good one, that if Valtrus is going to bring in settlement agreements, we believe they're going to use them to show the amounts and say, look, all these other people have already paid us for them, the people that

Valtrus -- Vertiv is allegedly trying to protect as their -- with their white hat. And, you know, we would then be compelled to say, well, these were licenses or agreements that were entered into under threat of litigation, or there's no indication that they were done because they support validity or infringement. It was potentially just a cost of defense. I mean, it just raises all the issues as to why parties settle -- settle cases. So --

THE COURT: How important to you is obviousness in connection with your invalidity case? I know you asserted --

MR. DAVIS: There's two claims, Your Honor, two claims where we have obviousness.

We're going to let Ms. Strong take over, Your Honor.

THE COURT: All right, Mr. Davis. Thank you.

MS. STRONG: I guess in the context of Vertiv's MIL 4, we would like to exclude the evidence of Valtrus's settlement or license agreements, as well as the purchase price of Valtrus's acquisition of the '287 patent. Obviously, we already know that the monetary valuations are not relevant because there's no damages in this case.

Secondly --

THE COURT: Well, to the extent you're relying on

obviousness for invalidity, the secondary considerations, commercial success and the like do come into play, and I guess what I'm asking is are -- in your estimation, is that evidence coming in worth the -- the addition of obviousness to your invalidity case?

MS. STRONG: So for obviousness, we only have -- Dependent Claims 5 and 6 are asserted as invalid for obviousness in this case. These are two dependent claims that we also have moved for summary judgment of non-infringement because we have a clear non-infringement position for those two claims.

Additionally, in response to Valtrus's motion for summary judgment of no lack of written description support, invalidity for Claims 5 and 6, we have argued for a sua sponte summary judgment motion that there's no written description for Claims 5 and 6.

And just for some additional context, Claims 5 and 6 relate to changing the temperature of the cooling fluid in response to a sum of sensed temperatures being outside a predetermined range.

Just as a quick preview of the lack of written description, the patent -- none of the -- the specification does not describe response to a sum of sensed temperature. In fact, the specification doesn't even include the words "sum" or "add."

In addressing the relevance of secondary considerations in particular, secondary considerations are only relevant when there is a nexus between the secondary considerations and the evidence of secondary considerations. They have not shown any nexus in their response to our MIL. And actually, in fact, their invalidity rebuttal expert report does not even identify the settlement agreements or the purchase price as a -- in their secondary considerations analysis.

So their expert would not even be allowed to discuss the settlement agreements or purchase price as -- in the context of --

THE COURT: Of course, secondary considerations can be introduced through evidence and witnesses other than experts.

MS. STRONG: Uh-huh.

THE COURT: So I don't know that it particularly matters. And I guess my question to you is do you need to rely on obviousness? If you were not relying on obviousness, the argument that Valtrus needs to put those settlement agreements before the jury for non-obviousness would -- would be insufficient.

MS. STRONG: Right. I mean, I think Vertiv would also be willing to drop the obviousness theories for Claims 5 and 6 because we have such a clear lack of written

description invalidity argument and non-infringement argument with respect to those dependent claims.

THE COURT: All right. You're saying if the settlement agreements are excluded based on irrelevance, you will not raise obviousness as a basis for invalidity?

MS. STRONG: Correct, Your Honor.

THE COURT: All right. Then thank you, Ms. Strong.

Let me hear back from Valtrus.

MR. BERKOWITZ: Your Honor, I -- it sounded like they just dropped their obviousness position on Claims 5 and 6, in which case I don't think we have a need to talk about settlement agreements, and for that matter, any customer-related litigation.

THE COURT: Well, I do think that that leaves us with just the bare issue that we started with, which is Vertiv is allowed to tell the jury something about why they're here, and it seems to me that this would be the time for us to decide what form that takes. Whether the word "threaten" is essential to that or not, we can talk about, but I do think that Vertiv would be entitled to tell the jury that it is seeking a declaration that will make it clear to its customers that they're not at risk of infringement of Valtrus's patent by using Vertiv's product.

MR. BERKOWITZ: I think the way you just said

that, I totally agree, Your Honor.

THE COURT: Okay.

MR. BERKOWITZ: That Vertiv -- and just to be clear about that, that Vertiv is seeking a declaration so that its customers don't have to worry about infringement.

What I think is not okay is to -- is to make it sound like we have been out unjustly attacking their customers and threatening them. That's unnecessary here. But Judge Gilstrap, I think, is perfectly capable and experienced obviously with managing exactly this in terms of telling the jury what their task is, and Vertiv can say it's looking for that declaration for that purpose.

THE COURT: The word "threatened" will be out there very quickly if -- if it is permitted, and that's why I'm bringing it up.

And you're right, I know Judge Gilstrap can handle all of this, but it's a lot harder to handle it after the fact than it is to handle it before the fact. So I want to get some agreement. But I think I understand your position on it, and let me see what -- what we can work Vertiv on.

MR. BERKOWITZ: Yeah. And, Your Honor, if we were covering Motion in Limine 4, there were actually three different things in there. So I just want to -- I don't know if we were done with that, but I think there's three separate points in their motion. I just want to make sure

that we haven't skipped over those in a sense.

There's a purchase price; the purchase agreement, which I think is a different issue; and then there's -- and then there's just a catch-all, which I frankly don't understand what it covers. So I can let them address that but...

THE COURT: Well, I was not trying to completely cover --

MR. BERKOWITZ: Okay.

THE COURT: -- their MIL 4.

MR. BERKOWITZ: Okay. Thank you.

MR. DAVIS: Your Honor, Bo Davis again.

It's hard to not use the word "threat" when that's exactly what it is.

THE COURT: How about the word "claim" that --

MR. DAVIS: Yes.

THE COURT: -- that their customers would not face the claim that they are infringing Valtrus's patents?

MR. DAVIS: I think we can live with claim, Your Honor. I think we could live with claim. And, you know, I think we're able to present the letters, refer to the lawsuits, and say Valtrus is claiming that our customers infringe, then I think we are -- we can -- we can avoid using the word "threat."

THE COURT: Well, you know, whether those

particular letters will come in or not --

MR. DAVIS: Understood, Your Honor.

THE COURT: -- is not an issue that I'm addressing at the moment. But my intent would be to deny your Motion in Limine No. 1, which seeks permission to refer to the existence of the other litigations and its indemnity obligations but to indicate that that does not prevent you from saying to the jury that Vertiv is seeking this declaration to prevent any claim that its customers are infringing this patent if they use your products, words to that effect.

And so this is your opportunity to argue against that outcome.

MR. DAVIS: Your Honor, understood. I would like to put a little more, I guess, color on it in terms of that claims have been made as opposed to a hypothetical claim in the future. I do think it's important that we are not just wasting the jury's time on a hypothetical issue but on a concrete issue that -- that has happened.

And so I just -- I'd like to get a little clarity on that if I could. I mean, I think it's important that we be able to say that Valtrus has claimed that our customers' use infringes and that we're here to resolve that claim or clear the air with respect to that claim, something along those lines.

So claims have been made. It's a basic fact. I think we can do that without saying threat for sure. I think -- it sounds like we can also do that without referring to a specific lawsuit. But claims have been made, and I think it's important to know that -- to not leave the jury with the impression that it's hypothetical.

THE COURT: Okay.

MR. BERKOWITZ: Your Honor, if I may have another word on that?

THE COURT: You may.

MR. BERKOWITZ: Your Honor, this whole case is hypothetical, and that's -- that's what we're litigating is theoretical use of something. All of these prior cases have been resolved. And so it's actually exactly what we're trying to prevent. I don't think there's any reason for the jury to know about -- I mean, if they're going to know about these past lawsuits, then they ought to know how they were concluded.

THE COURT: And I'm not hearing and I'm certainly not proposing to allow that the jury be informed about past lawsuits, but I -- I do think that it is appropriate to say something to the effect of -- that Valtrus has claimed, and that's what this decision -- that this case is to resolve.

MR. BERKOWITZ: I think the way you said it, Your

Honor, is exactly -- is exactly right, and we're totally -- we're in agreement about that --

THE COURT: Okay.

MR. BERKOWITZ: -- without a reference to specific notice letters or customers or things of that nature. I think that's -- that's the issue we're having is they want to parade around these notice letters, and it's going to just color us in terms of -- and they also don't even want the jury to know how those are resolved. But they're going to color us with all these letters and things and when we're trying to address infringement in the marketplace. That, we don't think is necessary, and it's just prejudicial.

THE COURT: All right.

MR. BERKOWITZ: Thank you.

THE COURT: Thank you, Mr. Berkowitz.

Mr. Davis, I am going to work on some language that will cover what we've talked about that -- that Valtrus has claimed that the use of your products by customers can infringe the patent, and you're seeking a declaration on that and the other issues.

MR. DAVIS: Okay. Thank you, Your Honor.

THE COURT: Okay. So Motion in Limine No. 1 will be denied with that caveat. That will be fleshed out in the ruling.

That takes us to No. 2.

MS. STRONG: I'll be presenting Vertiv's MIL 2, Your Honor.

So MIL 2 is seeking to preclude from introducing any evidence, testimony, or argument --

THE COURT: Ms. Strong, if you can speak up a bit, I'll hear you better.

MS. STRONG: I apologize. I'll try to talk louder.

Vertiv's MIL 2 is seeking to preclude from introducing any evidence, testimony, or arguments that use the prosecution history or the specification of the '287 patent for any claim construction or claim scope argument.

THE COURT: And, frankly -- I mean, that's a fairly easy MIL to grant, but unless it's much more specific, I don't know what it accomplishes. I doubt they're going to be saying we're making claim construction arguments here.

MS. STRONG: Agreed. So I guess to provide some additional context of this, I have an expert of Dr. Pokharna, which is Valtrus's expert's opening report, as to why this MIL is so important here is that Valtrus's expert opines on claim construction under the guise of providing the plain and ordinary meaning. And in this example, you can see he opines that in view of the

specification, a POSITA would understand the plain and ordinary meaning of sensing temperatures at one or more locations in said room to mean sensing temperatures at one or more locations on or near the rack or heat dissipating components, i.e., outside the cooling unit.

Dr. Pokharna also has several other opinions for other claim terms, again, opining on the construction of these claim terms under the guise of opining on the plain and ordinary meaning. And these are addressed more fully in Vertiv's motion to strike the expert report of Dr. Pokharna or various opinions in it, which is Docket 264.

THE COURT: So why should this be a motion in limine as opposed to just taking it up on the motion to strike?

MS. STRONG: We believe taking it up on the motion to strike would also be appropriate.

THE COURT: All right. I do think that if you had made the more specific version of this in your motion to strike, that would certainly be, I think, the most productive way to address it as opposed to trying to capture that in a general statement.

MS. STRONG: I agree, Your Honor.

THE COURT: If there's something that you think I would miss by doing it that way, tell me. But, otherwise,

I will deny this without prejudice to the motion to strike.

MS. STRONG: Thank you, Your Honor.

THE COURT: All right.

MS. STRONG: Just for context, we were just trying to be more fulsome with MIL 2.

THE COURT: I understand. It's a way to emphasize it or draw attention to it, but I don't think it's the sort of thing that I can cover in a one-sentence order.

All right. Thank you, Ms. Strong.

Do you have the next one also?

MS. STRONG: Yes, I'll also be addressing Vertiv's MIL 3.

Okay. So Vertiv's MIL 3 is seeking to preclude from introducing any testimony, evidence, or arguments relating to the declarations of Mr. Bash and Dr. Beitelmal.

And just to provide some context of who these people are, Mr. Bash is a co-inventor on the '287 patent and a prior art reference, which we have been calling Patel '104, and Dr. Beitelmal is a co-inventor of Patel '104, the prior art reference, but not the '287 patent.

And, essentially, Valtrus is currently seeking summary judgment that the Patel '104 reference does not qualify as prior art because they are using these declarations to show or to assert that Dr. Beitelmal did not contribute to the anticipating disclosures of Patel

'104, and, therefore, even though Patel '104 is by three inventors, one of which is not on the '287, only the anticipating disclosures are from the co-inventors of the '287 patent.

THE COURT: And so let me understand. Are you, through this motion in limine, seeking to control the use of these declarations at trial or in connection with this motion?

MS. STRONG: At trial.

THE COURT: All right. And is it just the declarations themselves, these physical documents, that you're seeking to in effect exclude by means of this MIL, or are you also taking the position that the information in those declarations is -- should be off limits?

MS. STRONG: We believe the information in the declaration should also be off limits because they were just produced so late and after fact discovery.

THE COURT: Well, if the -- if Mr. Bash or Dr. Beitelmal is a witness, why wouldn't their knowledge be admissible, whether it was mentioned in that declaration or not?

MS. STRONG: Right. I mean, if they wanted to bring him at trial, that's fine. We would seek to minimize the prejudice to Vertiv, however -- at least a one-and-a-half, two-hour remote deposition of whoever

they're bringing to trial. However, Valtrus still hasn't identified if they are actually going to bring Mr. Bash or Dr. Beitelmal to trial yet, so we would like to know that, I guess, sooner rather than later to mitigate any prejudice by -- on Vertiv.

THE COURT: And my understanding of what you're setting out in your motion in limine here is that these declarations were not served on you until after the close of fact discovery?

MS. STRONG: Yes. After the close of fact discovery and actually also after Vertiv had served its opening and rebuttal expert reports.

THE COURT: Well, that at least states a prima facie -- prima facie case for excluding them under Rule 37.

But let me see if I can get a better understanding of what Valtrus's position is, and then I'll give you a chance to respond to that position.

MS. STRONG: Thank you, Your Honor.

THE COURT: Thank you, Ms. Strong.

MR. HOUGHTON: So the two declarations themselves were summary judgment evidence. They're proper summary judgment evidence under Rule 56. We don't see any issue with that. We're not seeking to admit the declarations at trial. They're not on our exhibit list. They were used because this 102(e) issue we think is pretty much a legal

issue that the Court should decide. We have not found a single case where 102(e) and whether something is prior art by another has ever once been tried to a jury. I don't think it has.

So we're trying to avoid this super confusing issue being a jury issue. We put in the information that we think would be helpful to decide it. They supplemented their expert report to address the declarations for the summary judgment record.

So in terms of that, we don't think there's any issue with you looking at them for summary judgment and deciding whether this is even an issue that needs to go to trial.

As far as trial goes, it sounds like they agree, we can call the witnesses live and ask them about this at trial. I mean, talk about important evidence. The question is whether this was actually invented by Dr. Beitelmal or not. And so precluding him from testifying at trial about that makes no sense. Frankly, we offered him for a deposition twice, and they declined twice. So --

THE COURT: And are Mr. Bash and Dr. Beitelmal on your exhibit list -- witness list?

MR. HOUGHTON: They are on our witness list as may calls. It obviously depends if this issue is going to

trial or not. We would call -- Beitelmal has never been deposed, so he would be a live witness.

I think I'm getting a note.

THE COURT: And so your experts are not going to rely on the contents of these declarations either?

MR. HOUGHTON: Not on the declarations themselves. So our technical expert did have a conversation with Mr. Bash, which is -- obviously, the conversation itself is hearsay, but experts are allowed to rely on those types of conversations and form opinions. That's fully laid out in his expert report. They know exactly what it was. They deposed our expert about it.

THE COURT: But that was not a reliance on his declaration, that was a reliance on his conversation?

MR. HOUGHTON: Correct. The declaration came later, and it basically just summarized what he told the expert.

THE COURT: All right. Then my inclination on this would be to find that based on the representation by Valtrus that this declaration -- these declarations are used solely in connection with the motion for summary judgment, that the MIL is otherwise moot. And I'll give Ms. Strong a chance to show me otherwise.

MS. STRONG: I would say largely we agree with Your Honor. However, again, like, if Valtrus is permitted

to -- or is bringing Bash or Beitelmal to trial, Vertiv requests the chance to do a remote, short two hours or less deposition of whoever is coming to trial to testify.

THE COURT: And how does that relate to this MIL?

MS. STRONG: This would -- I guess for the Rule 37, just an opportunity to cure the prejudice to Vertiv due to the late disclosure of the facts asserted in the declarations.

THE COURT: My understanding is that these declarations are not being offered as any kind of evidence, except in connection with the motion for summary judgment. And they're certainly completely appropriate for that. So I don't know how that relates to whether or not Vertiv should have or desires to take their deposition.

MS. STRONG: Well, Your Honor, those same facts in Mr. Bash's declaration were also in Valtrus's rebuttal expert report based on his conversation with Mr. Bash. And Vertiv has never had an opportunity to cross-examine Mr. Bash regarding that conversation of the facts asserted.

THE COURT: So what you're saying is you did not know that Valtrus's expert was going to be relying on the testimony of Mr. Bash until you saw that expert report?

MS. STRONG: Yeah. And actually that expert report happened -- we received the expert report I believe two days after this off-the-record conversation with

Mr. Bash. We weren't even invited or informed of the conversation until we received the expert report.

THE COURT: Well, I guess you're saying the conversation was only two days before the report?

MS. STRONG: I mean, I guess -- don't quote me on the two days. But it was just a couple of days. I believe it was -- or, sorry, I think the conversation was February 24, and the rebuttal report was February 2, so six days, with quick math.

THE COURT: I'm not sure -- February 2 and February 24?

MS. STRONG: No. February 24th and March 2nd. I apologize, Your Honor.

THE COURT: Oh, March 2nd.

All right. Well, I guess part of the problem I'm having is I'm not sure what the reopening of discovery has to do with this issue.

But I'll ask you to meet and confer with Valtrus, and if there is an issue about taking that deposition, let me know. But I don't think that it is -- sufficiently relates to this issue to take it up on the fly.

MS. STRONG: Okay.

THE COURT: So I'm going to find that MIL 3 is moot based on the representation that these declarations are only being be offered in connection with the MSJ.

And you can go to the next motion.

MS. STRONG: Okay. Your Honor, I'll also be presenting Vertiv's MIL 4, which is seeking to preclude from introducing any evidence, testimony, or argument related to Valtrus's settlement agreements or license agreements, the purchase price of Valtrus's acquisition of the '287 patent or any other patent, or any other materials relating to monetary valuations of the '287 patent and technology covered by the same.

Since we've dropped obviousness for Claims 5 and 6, there are no secondary considerations at issue anymore, and there is no damages in this case. So there's just simply no relevance of this information. And Vertiv would believe it's highly prejudicial because if the jury were to see that these customers were settled -- are settling for large amounts, we're worried that they might think that that indicates either infringement or validity.

THE COURT: All right. Ms. Strong, what I'm going to do is to give Valtrus the opportunity to set out exactly what it is in this list that they think is still relevant, and I'll give you a chance to respond. Thank you.

MS. STRONG: Thank you.

MR. BERKOWITZ: Your Honor, I think we've dealt with the settlement agreements already. It's only -- it's only secondary considerations, and obviousness is now gone.

The only caveat I'll throw on that because Mr. Davis brought up exhibits and these notice letters and threatening customers, that if for some reason that does come in as an exhibit, we'd want to be able to tell the jury how those things were resolved, of course. But other than that, Your Honor, I think we're in agreement on the settlement agreements.

The purchase price is just a little bit different. That's the amount that Valtrus paid to Hewlett-Packard to buy this portfolio of patents. And the only thing I'd say about that, Your Honor, is I think it actually -- it should rise and fall with one of our motions in limine, and that motion in limine is about talking about our investors and private equity funds and hedge funds and those things. And, Your Honor, I was here in a Valtrus/SAP case addressing the same issue, and I think we settled on that, saying, well, you can't talk about private equity or hedge funds.

But here, Your Honor, we don't even have damages. So the only relevance of talking about investors would be, you know, how much did we pay for it? So those two things go together.

THE COURT: I don't think -- Mr. Berkowitz, I don't think in that case that the issue was investors. I think it was owners.

MR. BERKOWITZ: It was -- I think it was investors. We settled on they could say sophisticated investors, Your Honor. That was actually one of the motions in limine. Valtrus had moved about not calling us private equity or hedge funds and talking about that at all. And I think the resolution was about SAP could reference sophisticated investors.

THE COURT: Well, the -- that may have been the outcome, but I think the issue -- what the other side was trying to put forth was the corporate structure. And one of the links in the ownership appeared to be a hedge fund, and that was -- and that was what you were successful in keeping out. But I cannot recall ever allowing discussion in front of the jury of simple investors.

MR. BERKOWITZ: Yeah, okay. And that's -- and that's where we're -- that's where we're at, too, Your Honor. And that's what I'm saying, we don't have a need to talk about the purchase price of the -- of the portfolio unless they're talking about our investors, in which case I think those two things go together. So maybe I should have framed this differently, that we're actually not objecting to this motion in limine on the purchase price piece unless they want to talk about our investors, in which case we think those two things go together.

THE COURT: All right. Well, I will say that I'm

going to grant Motion in Limine No. 4, but you can revisit it if something comes up in this next MIL that you're talking about that I'm not currently thinking of.

MR. BERKOWITZ: Thank you, Your Honor.

And just there's -- I think there's one last kind of hanging category there I would just like to talk about, this, quote, any other materials relating to monetary valuations. I just -- I don't think we know what that's referring to, and we don't want to step in something accidentally here. And I guess to the extent Your Honor is inclined to grant this in whole, I just -- I'd ask for Vertiv to give a little more clarity on what's that even referring to, because I don't know what it is.

THE COURT: That's a reasonable request.

MR. BERKOWITZ: Thank you, Your Honor.

THE COURT: Thank you, Mr. Berkowitz.

MS. STRONG: I guess just to clarify the "any other materials relating to monetary valuations," we just wanted to make sure -- like, just to be fulsome to make sure no other, I don't know, testimony or evidence about the monetary value of the '287 patent came in.

THE COURT: Are you aware of anything else that would fall within that category?

MS. STRONG: Outside of the purchase agreement and license agreements, we don't think so.

THE COURT: All right. Thank you, Ms. Strong.

Mr. Berkowitz, is there something that you're concerned might be covered by that term "monetary valuations"? And one reason I ask is that, you know, the effect of a motion in limine is to say seek leave before you go there, and so you are not foreclosed from ever doing it if something comes up, but monetary valuation is a fairly specific thing. It's -- to me, a monetary valuation is a dollar amount.

MR. BERKOWITZ: Okay. And if it's specifically tied to the '287 patent, I don't really have any concerns, Your Honor, but it's this technology covered by the same. Like, I guess what we envision, we're, of course, going to have a corporate representative get up and say who Valtrus is, who's its parent company. You've heard these things before in other cases. And, you know, we have a business. And so she's going to -- or he is going to talk about that business, and I don't want that to be construed as, well, you're -- you know, you're talking about your investments in the business and, you know, how you buy things. I just -- it just -- there's just a vagueness to it that I wanted a little bit of clarity. If it's just monetary valuations of the '287 patent, I think we're totally clear.

THE COURT: All right. Thank you, Mr. Berkowitz.

Ms. Strong, my inclination is to respect that

argument and just grant it except for the last clause "and technology covered by the same." I don't know why that would be objectionable.

MS. STRONG: We agree with that, Your Honor.

THE COURT: All right. Then I will grant Motion in Limine No. 4 with that exception.

MS. STRONG: Thank you.

THE COURT: And we will take the lunch break now.

I would like counsel to talk over the break about whether they think it would be productive to go into the specific exhibits. I'm free to do that, but I -- I would like you to make a decision about whether you think this would be the best day to do it.

MR. BERKOWITZ: Your Honor, if I could --

THE COURT: Mr. Berkowitz?

MR. BERKOWITZ: One thing. This is a bit of a personal matter, Your Honor. I have some family obligations tonight, and I have a 4:00 o'clock flight from Shreveport. So if I -- I just want to preview if I could be excused around 2:15 to catch that flight. Mr. Houghton knows more about all this than me anyway, and I'm sorry about that, Your Honor, but would appreciate if I could be.

THE COURT: And that's fine. You can be excused whenever you need to be excused.

MR. BERKOWITZ: Thank you, Your Honor.

THE COURT: But talk about that, and we will start back up at, let's say, 1:20.

MR. BERKOWITZ: Thank you, Your Honor.

COURT SECURITY OFFICER: All rise.

(Recess.)

COURT SECURITY OFFICER: All rise.

THE COURT: Good afternoon. Please be seated.

And I think we are ready to move on to the Defendant's motions in limine.

MR. HOUGHTON: Good afternoon, Your Honor. We've withdrawn our first motion in limine. We let them know already. So we can just jump right into the second one, if that works for you.

THE COURT: All right.

MR. HOUGHTON: And also we did confer about the exhibits, and we both agreed it makes sense to defer that to the next pretrial conference in light of the different developments that happened this morning.

THE COURT: All right. That makes sense.

So No. 2?

MR. MCCARTHY: Good afternoon, Your Honor. Sean McCarthy for Valtrus.

THE COURT: Good afternoon.

MR. MCCARTHY: Vertiv has created a mockup figure -- it's not in the '287 patent -- according to what

they believe is a preferred embodiment of what the '287 patent should be.

Judge Gilstrap already has standing MIL 18, which precludes the parties from introducing testimony or evidence or argument for purposes of infringement or non-infringement, comparing the accused product to preferred embodiments of the patent.

But Vertiv goes one step further with this, which is even more egregious. It takes a figure from a different patent and modifies a figure in the '287 patent and then wants to show that to a jury in explanation of what the plain and ordinary meaning of air conditioning unit, which Mr. Houghton talked a little bit about this morning, and why if this -- if their accused system does not work like what's shown in this mocked-up figure from the patent, they do not infringe.

THE COURT: Mr. McCarthy, is your understanding of Vertiv's opposition to this MIL that they're only going to use this diagram as a demonstrative if they use it at all?

MR. MCCARTHY: Yes, Your Honor. At least my understanding at this point is that they would use it as a demonstrative to establish the plain and ordinary meaning of air conditioning unit for purposes of comparing their accused systems to this mocked-up figure for purposes of non-infringement.

THE COURT: Doesn't that pretty well accomplish what you're after in that they cannot then use this over your objection without leave of Court?

MR. MCCARTHY: Well, MIL 18 -- and no surprise, Your Honor -- doesn't actually expressly say you cannot create figures or mock up figures.

THE COURT: I guess where I'm going is a demonstrative can only be used after you've had an opportunity to object to it and that objection has been overruled.

And if -- I understand the concern that, well, what if they just pull it out in front of a witness and start using it, you've already got an issue then. But I am understanding what they said, and I would, of course, confirm this with them, that they will only use this in front of the jury if it's permitted as a demonstrative, which would mean either you didn't object or the Court overruled the objection.

MR. MCCARTHY: Our second concern, Your Honor, is that they would use it in that second matter crossing our expert witness with this demonstrative, where then we wouldn't have an opportunity to object before it -- it's introduced.

THE COURT: Well, I -- my inclination is to make sure that this would not be used without you having an

opportunity to object to it by one means or another.

And so let me hear from them and see if we can figure out how easiest to accomplish that.

MR. MCCARTHY: Thank you, Your Honor.

THE COURT: Thank you, Mr. McCarthy.

MS. STRONG: Your Honor, your understanding is correct. Vertiv only intends to use this as a demonstrative, so they would have the chance to object at the proper time at trial.

THE COURT: Well, what I'm going to do, then, is just find that this is moot based on the representation, and I'll put it in the ruling, the representation by Vertiv that it will not use it over objection unless it's been cleared with the Court as a demonstrative.

MS. STRONG: I agree with that, Your Honor.

THE COURT: All right. Then thank you, Ms. Strong.

MS. STRONG: Thank you.

MR. FINDLAY: And to be clear, Your Honor, that includes cross-examination, which under the normal rules, we don't have to disclose demonstratives. That was Mr. McCarthy's concern.

THE COURT: I understand what you're saying, and it -- I will write it in such a way that it is clear that it can only be used either by agreement or with leave.

MR. FINDLAY: Thank you.

MR. MCCARTHY: Thank you, Your Honor.

THE COURT: All right.

MR. HOUGHTON: Your Honor, our Motion in Limine No. 3 is about Valtrus's pre-suit diligence and investigation into its infringement claims prior to bringing this lawsuit. We don't think there's any relevance to that, and we think it's highly prejudicial under Rule 403.

We attached to the motion some portions of the depositions of our two witnesses who are going to come to trial where they asked exactly this type of question. And I understand normally you're not going to get into deposition issues at this time, but these witnesses are coming live, and so the concern is eliciting this kind of testimony live.

THE COURT: And is this MIL limited to what is in the caption of it, the title of it, pre-suit diligence and investigation and HPE's non-assertion?

MR. HOUGHTON: That second part we're actually narrowing down further, so I'm focused on the first part right now.

THE COURT: Okay. Narrow the second down.

MR. HOUGHTON: Yeah, so the second part -- if they want to say HP had these patents for 20 years and didn't

sue us, they can say that if they want to. We're not -- we're not including that anymore.

Obviously, if they go further and try and make some kind of improper argument, we reserve the right to object at the time. We do --

THE COURT: So it sounds like you're not pursuing the non-assertion part of it.

MR. HOUGHTON: Right. The only part of that we're still concerned about is them saying HP didn't think Vertiv infringed, and that's why they didn't sue us. There's no testimony about that in the record. That's pure speculation. It's prejudicial. It's also just not true. There's no evidence to support it, so we don't think they should be allowed to say that.

But in terms of the non-prejudicial sort of statement that I said before, that part we are not objecting to at this time.

THE COURT: All right. Thank you, Mr. Houghton.

MR. GRAY: Good afternoon, Your Honor. Michael Gray for Vertiv.

Vertiv does not dispute and does not intend to make any argument about Valtrus's pre-suit diligence or pre-suit investigation, so those concerns are -- they're just not there. So if Your Honor wants to enter that order, that is completely fine.

THE COURT: All right.

MR. GRAY: The issue that we do still have is regarding the HP license. We think it is completely appropriate to be able to enter not only the evidence that HP knew about the license but also that Vertiv -- HP was one of Vertiv's customers. HP had a business relationship with Vertiv. And HP never said that Vertiv in all that time was either infringing or had no license. So we do -- we do still dispute that, Your Honor.

THE COURT: So what I heard from Valtrus was they did not want Vertiv to argue that HP didn't believe that -- that Vertiv was infringing the patent.

MR. GRAY: If that's the words he used -- I'm not going to dispute his words, but I'm not going to argue what HP believed because I don't know HP.

THE COURT: Okay. So I'm just trying to figure out what the conflict is that needs to be resolved here.

They're not disputing that the facts can come out that HP owned it for however long it owned it, never asserted it.

You mentioned license. They didn't mention license. Do you have evidence that HP considered that Vertiv was licensed?

MR. GRAY: Well, HP produced the license.

THE COURT: Well, it wasn't a license to Vertiv.

MR. GRAY: It was a license to Vertiv's predecessor.

THE COURT: Okay.

MR. GRAY: So that would be -- that would be Evidence No. 1. I could go through the evidence if that's what you're asking me to -- to do so, Your Honor. I'm not sure it clarifies the dispute between us, but however --

THE COURT: I don't know what -- how does that relate to this MIL, I guess, is what I'm trying to figure out?

MR. GRAY: Certainly, sir. So the MIL itself, No. 3, exclude evidence or argument about Valtrus's pre-suit diligence, no dispute and investigation -- Valtrus's investigation, no dispute.

HP's non-assertion of the asserted patent. Vertiv --

THE COURT: They're dropping that part.

MR. GRAY: Well, that's what he didn't exactly do. He said I'm dropping -- I'm narrowing it. I'm dropping most of it. If we drop the HP non-assertion and the MIL is only to exclude argument or evidence about Valtrus's pre-suit diligence and Valtrus's investigation, we have no dispute.

THE COURT: All right. Let me just ask, Mr. Houghton, do we have a dispute?

MR. HOUGHTON: It sounds like there still might be a little bit of a dispute because they just said all these things that they're going to use to then come to the ultimate conclusion HP must have thought Vertiv didn't infringe, HP must have thought Vertiv was licensed, and there's no evidence of that at all in the record.

THE COURT: Well, I -- all right. If that's what I need to drill down on, I will.

All right. Mr. Gray --

MR. GRAY: Yes, sir.

THE COURT: -- do you intend to or do you want your side to be able to tell the jury what HP thought about either the license or infringement?

MR. GRAY: I'm cognizant of the fact that I'm not going to be able to tell the jury what another company or corporation believed.

THE COURT: Unless it came out in the deposition, I don't know. But --

MR. GRAY: I think what we want to do is put into the evidence that reflects -- and we will ask the jury to make a finding of that, but the evidence that we want to put in is that HP had this license, HP knew about this license, they produced it, they had it for 20 years, they were a customer -- first, they were a --

THE COURT: If the license issue gets to the jury,

I agree with you that there's a lot you'll be able to say about it. I do think that the odds are that that's an issue that the Court can resolve. But if the license issue is presented to the jury to be decided, then obviously you're going to be entitled to tell the jury about the history of the license.

MR. GRAY: And I think that's another concern for the MIL for us is that if the MIL, as written, is granted, it's kind of -- it would moot the summary judgment -- it would take -- it would take out the entire license issue, as Your Honor just pointed out. So --

THE COURT: What part of it, as written, would do that?

MR. GRAY: Eliminate, exclude evidence about HP's non-assertion of the asserted patents. Just reading from their title on Page 4 of their -- of their motions, Your Honor.

THE COURT: Yeah.

MR. GRAY: So in the first sentence -- or the second sentence, it also -- reading from their motion, it also wants to apply non-infringement -- Vertiv wants to apply non-infringement based on delay and filing of suit, relying on the fact that HP never asserted these patents or informed Vertiv and its predecessors about infringement, and then something else about Valtrus.

So it's that second part in the second sentence, relying on the fact that HP never asserted these patents or informed Vertiv about infringement, we think that is still -- that should not be excluded under a MIL because it's too subsumed within the license issue, as discussed all day.

THE COURT: All right. Thank you, Mr. Gray.

Mr. Houghton, unless you can persuade me otherwise, I'm going to grant your MIL 3 but solely to the extent of excluding evidence or argument about the pre-suit diligence and investigation.

MR. HOUGHTON: I think that's fine, Your Honor, but I would ask that you deny without prejudice the second part to reurge, if necessary, after the license issue gets addressed further.

THE COURT: You're certainly entitled to assert contemporaneous objections and everything else. This will be your last chance to seek a MIL on it, but...

MR. HOUGHTON: The record right now has absolutely nothing about what HP thought, and so right now if we're proceeding, then they shouldn't be allowed to talk about what HP thought because there's no evidence. It's pure speculation. And so that's -- that's it.

THE COURT: Well, is there any indication that they intend to talk to the jury about what HP thought?

MR. HOUGHTON: Well, I think it's obvious what they're going to do. They're going to say HP had these patents, they have a business relationship, there used to be a license, so by implication, HP must not have thought they infringed. And if they're agreeing not to say that, then I think that resolves it.

THE COURT: Well, I mean, I -- that does not appear to me to be what you are seeking in this MIL, something that -- about what HP's intention or belief was.

MR. HOUGHTON: I do think the MIL, as written, was much broader, but based on how the morning went with the license issues, we've been trying to narrow it down, and I think that we still feel like talking about HP's thought process and what they believed as part of an opening or a closing argument would be improper. But I think we can raise the objection at the time, if need be.

THE COURT: I think that if they start speculating about the frame of mind of some third party, that you'll have a good objection.

MR. HOUGHTON: Thank you, Your Honor.

THE COURT: But I'll grant this to the extent of evidence or argument about Valtrus's pre-suit diligence and pre-suit investigation.

And that takes us to the next MIL.

MR. BERKOWITZ: That one is me, Your Honor. Matt

Berkowitz.

THE COURT: Go ahead, Mr. Berkowitz.

MR. BERKOWITZ: So I want to -- this one is about investors and funding structure, Your Honor. I mean, you're familiar with, I think, to some extent the corporate structure that Valtrus has. It's the patent owner here, but it has a parent company, Key Patent, that is the Plaintiff in a lot of cases that we also have before this Court that has 12 to 15 employees and actually does license -- has a licensing business.

We understand that, and that, I think, is fair game when we're talking about corporate structure here in terms of what can be talked about at trial. Everything above that, from a corporate structure standpoint, are all investment entities. And that's what we think should be off limits.

In SAP, for example, and both parties are familiar with this case and the Court's ruling on that, there was actually a damages issue that was tied to some discussions that Valtrus and its predecessor had had with the investors. And so there was a damages question about whether that could come in -- I think it actually was in evidence. There was a presentation that had been made to the investors, and that did come into evidence. And then there was a question about, well, how can we refer to them?

We talked about that this morning.

But there's no such damages issue here. There's no reason the jury needs to hear about -- certainly not private equity or hedge -- private equity firms or hedge fund, but even investors. I don't see any relevant reason for that.

And we talked earlier this morning about one of Vertiv's motions in limine. The only -- the only possible relevance we could imagine would be to explain the purchase price and where the money came from. And that's -- that's the only connection I see to some relevant piece of information, whereas if Valtrus were to introduce the purchase price and how much money it paid for these patents, that, of course, you know, maybe Vertiv could talk about investors.

THE COURT: So what you're saying you don't object to is discussion about who owns Valtrus?

MR. BERKOWITZ: From -- from a Key Patent standpoint. Those are the companies that are actually in the licensing business, and our corporate representative is going to have a connection to Key Patent. But everything above that, you're talking about private equity and investment vehicles and things, and I don't see a relevant reason for that.

THE COURT: Key Patent is a party to some

litigation. Is it a party to this?

MR. BERKOWITZ: It's not a party to this.

THE COURT: Okay.

MR. BERKOWITZ: They brought the case, and they did not DJ Key Patent.

THE COURT: And your understanding is that Key Patent is the entity that owns Valtrus?

MR. BERKOWITZ: Key Patent is the entity that owns Valtrus directly.

THE COURT: And so what you're seeking is that there be no evidence as to who owns Key Patent?

MR. BERKOWITZ: Right. Because they're just investment vehicles. Key Patent itself has a number of employees that are engaged day-to-day in licensing and looking at these things, and it's part of the actual, to the extent you want to call it this, an operating business.

THE COURT: All right.

MR. BERKOWITZ: Now, of course, you know, they can explain that we're -- we don't make products, we're a non-practicing entity, but those are the operating businesses, and I think that's fair game. That's fine. I just don't see a relevance to the investors above that here.

Thank you.

THE COURT: All right. Thank you, Mr. Berkowitz.

MR. GRAY: Your Honor. I think the primary concern that Vertiv has is -- as we've discussed today, is that we need to be able to explain who Valtrus is from a corporate entity standpoint, from a corporate formation structure, and we're happy -- and we've made the offer to limit the -- to make the same agreement as the SAP MIL, and I don't know -- I can read that, Your Honor, if you're -- if you'd like me to.

So in the SAP MIL, the parties agreed that to the extent Defendants may refer to Plaintiff's funders, such as Centerbridge, by name or as a sophisticated investor, but not by terms like hedge fund or private firm -- or private equity firm, sorry, we're fine with that. They don't want to agree to that. That's okay. But we think that's reasonable.

THE COURT: Why do you need to refer to anyone beyond Valtrus and Key Patent?

MR. GRAY: Well, Your Honor, I wasn't quite clear from Mr. Berkowitz -- are we -- would we be allowed to reference Key Patent? And I think what I heard was their corporate witness is --

THE COURT: What I heard was yes.

MR. GRAY: Okay. And then -- and that's in the patent purchase agreement. So if we're -- if Vertiv is allowed to explain the corporate formation and structure of

Valtrus, at least to Valtrus and Key Patent, then that's enough.

THE COURT: And that there is no need to refer to who the investors are who own parts of Valtrus -- or I guess it would be that owned parts of Key Patent, because it's my understanding that Key Patent owns Valtrus.

MR. GRAY: That's my understanding, as well, Your Honor --

THE COURT: All right.

MR. GRAY: -- subject to correction by my colleagues.

THE COURT: All right. So I don't see how there'd be any relevance to who the investors in Key Patent are.

MR. GRAY: I'm sorry, Your Honor. I missed that. I apologize.

THE COURT: I was just saying I don't see how there's any relevance to who the investors in Key Patent are.

Do you have an argument that there is some relevance?

MR. GRAY: No, I do not.

THE COURT: Okay. I guess the only concern I have is you indicated that as long as you can discuss the corporate structure. Is there something else about the corporate structure that you're wanting to put before the

jury beyond the fact that Valtrus does whatever kind of business Valtrus does? I understand that's not being restrained by this MIL, but it's just what's above the owner of Valtrus, which is Key Patent. You can -- that's fair game. What's above them is something that you would need to seek leave to get into.

MR. GRAY: With that understanding, Your Honor, we have no objection to that.

THE COURT: All right. Thank you, Mr. Gray.

Is there something else that Valtrus wants to accomplish on this MIL beyond that?

MR. BERKOWITZ: No, Your Honor. I think -- I think everyone is on the same page now.

THE COURT: Okay. Go ahead, Mr. Berkowitz.

MR. BERKOWITZ: Oh, I was going to short-circuit this in saying we think that MIL 5 is moot, so we're withdrawing that one, as well, because of the settlement agreement discussion.

THE COURT: All right.

MR. BERKOWITZ: And we did inform Vertiv of that before.

THE COURT: And pardon?

MR. BERKOWITZ: I'm sorry, we did inform Vertiv of that earlier.

THE COURT: All right. I know that you have a

number of pending motions, and we've talked about some of them. I'm going to try to prioritize the motions that we've talked about, and that includes the motions about the license issue and the -- what -- what Valtrus described as the 02 Micro issue, the motion for summary judgment by the Plaintiff on the air conditioning unit issue, I think -- the motion to strike Dr. Pokharna's testimony.

Are there other motions that either side thinks it is important to try to prioritize? Obviously, I know they're all going to be ruled on, but only so many things can be first.

What else?

MR. MALONEY: From Vertiv's perspective, Your Honor, the ones you just recited are -- we think are the most important and will have the biggest impact in kind of sorting through what case we're taking to trial.

THE COURT: All right. Thank you, Mr. Maloney.

MR. BERKOWITZ: We agree, Your Honor.

THE COURT: All right. I would offer to hear argument on some, but to tell you the truth, I think that I really need to be able to look through the agreements that have been referenced and be better prepared for the argument for it to be effective.

We talked about an amendment to cover the license issue. I would like to have an understanding about when we

can expect that.

MR. SCHWARTZ: Your Honor, we could have that on file by a week from today, if that is acceptable.

THE COURT: All right. I guess that's -- it's going to be more than I'm currently expecting.

MR. SCHWARTZ: Oh.

MR. MALONEY: We can do it sooner. We just have some --

MR. SCHWARTZ: Yeah, we have some travel -- that was the only reason why. Your Honor, if you'd like us to get it on file tomorrow, we could do that, as well.

THE COURT: I think the sooner the better.

MR. SCHWARTZ: We will do that, Your Honor.

THE COURT: And what I would also like then is for the -- for Valtrus to give some thought as to what discovery they think they need and to talk with you about it.

In the meantime, I'll be trying to address the pending motions that go to license, and maybe we will get those done before we have to reach this discovery issue, but I still would like the Defendant -- or like Valtrus to be prepared to answer that question on relatively short notice when it's made.

What -- what other questions, Mr. Schwartz, does the -- does Vertiv have at this time?

MR. SCHWARTZ: Your Honor, just to clarify or make our position known that we would appreciate the opportunity to argue those motions --

THE COURT: Okay.

MR. SCHWARTZ: -- and believe that it would be of great assistance to Your Honor in resolving them.

THE COURT: I'll keep that in mind, and I'll know better after I dig into them a little, but I will definitely let you know.

MR. SCHWARTZ: Then nothing else from our end, Your Honor.

THE COURT: All right. What about for Valtrus? Mr. Houghton?

MR. HOUGHTON: Just a quick procedural question. Are you essentially giving them leave to file the amended complaint now on the license issue?

THE COURT: I am, with the understanding that it -- it will be just including their license claim in what they already have. If you look at it and you determine that it's not what you think the Court is currently contemplating, I expect to hear from you. But they don't need to file a separate motion for leave. They can simply file that based on this order.

MR. HOUGHTON: And then can we stay having to respond to this amended complaint until you rule on the

summary judgment motion?

THE COURT: I don't see why not. That's fine.

MR. HOUGHTON: Thank you, Your Honor.

THE COURT: All right. Well, like I said, I am expecting that you'll be hearing from the Court about the July or August term, and I know that Judge Gilstrap's starting a trial up there today. So it likely won't be before next week after this trial is over. But as soon as we get a determination, I'll make sure you know. And we'll follow up with a pretrial conference date that matches the trial date and hope that at that time, we've got some progress on the motions.

So with that, thank you. And we're adjourned.

COURT SECURITY OFFICER: All rise.

(Hearing concluded at 1:52 p.m.)

CERTIFICATION

I HEREBY CERTIFY that the foregoing is a true and correct transcript from the stenographic notes of the proceedings in the above-entitled matter to the best of my ability.

/S/ Shelly Holmes
SHELLY HOLMES, CSR, TCRR
CERTIFIED SHORTHAND REPORTER
State of Texas No.: 7804
Expiration Date: 10/31/2027

5/21/2026
Date